## BARNETT et al. v. Q. & C. CO.

(Circuit Court of Appeals, Seventh Circuit. August 6, 1915. On Petition for Rehearing and Modification of Decision, September 1, 1915.)

### No. 2293.

1. PATENTS ⊙⇒214—LICENSES—RESERVED RIGHT OF FORFEITURE—WAIVER.

Complainant, which, with the exception of the manufacturer, held an exclusive license to sell a patented device on a royalty, joined with all other parties interested in the patent in what was called a "promotion contract," by which complainant was to advance a stated sum to be used for advertising and promotion purposes, for which it was to be reimbursed in part from the royalties due from it on account of the second million of the devices sold by it thereafter. *Held*, that such contract operated, either by implied agreement or by waiver, to modify the license contract, so as to annul any right of forfeiture reserved therein for failure of complainant to earn a minimum royalty in any year while the 2,000,000 devices remained unsold.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 321-327; Dec. Dig. ⊙⇒214.]

2. PATENTS ⊙⇒214—LICENSES—RESERVED RIGHT OF FORFEITURE—WAIVER.

A reserved right of forfeiture of a license under a patent for breach of an obligation may be waived before breach by an act or declaration inducing the licensee to continue in the performance of its obligations and upon which it was reasonably justified in relying as showing an intent to suspend the exercise of the right.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 321-327; Dec. Dig. ⊙⇒214.]

3. INJUNCTION ⊙⇒59—EXCLUSIVE LICENSE—PROPERTY RIGHT.

An exclusive license under a patent is a unique property right, against the destruction of which a court of equity will give protection by injunctive relief.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 114-116, 128; Dec. Dig. ⊙⇒59.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Q. & C. Company against Otto R. Barnett and the P. & M. Company. Decree for complainant, and defendants appeal. Modified and affirmed.

On April 30, 1907, in the settlement of conflicting patent rights on so-called anti-creepers or rail anchors, Quincy-Manchester-Sargent Company, predecessor of and which for the purposes of this case may be deemed identical with Q. & C. Company, Quincy, who controlled it, Belle City Malleable Iron Company, Laas & Sponenburg Company, Scott Manufacturing Company, and certain individuals who controlled these corporations, entered into an agreement, hereinafter referred to as the anti-creeper agreement, whereby a large number of patents and patent applications were vested in one O. R. Barnett, but solely as trustee for the purposes defined in the agreement. It covered also future inventions and patents on anti-creepers that might be made or acquired by any of the parties. Pursuant to the terms of and contemporaneously with the agreement, Barnett as trustee gave the Q. & C. Company an exclusive selling license, subject to the payment to the trustee of certain royalties and terminable 30 days after notice for failure to make good within the 30 days any breach of any of the obligations therein assumed by the licensee and specified in the notice, or to sell in any calendar year after 1908 such a quantity of the devices as would yield at least $30,000 in royalties.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On August 18, 1909, Barnett, under authority of the other parties, entered into a contract with one Vaughan and the M. W. Supply Company, his licensee under certain anti-creeper patents granted to him, whereby, after reciting the patent holdings of the parties, an exclusive license was granted to Barnett to make, use, and sell and so to license others under the Vaughan patents until February 10, 1920 (at which time one of the basic patents, then held by Barnett as trustee, expired), upon certain terms and conditions, among others, that he grant an exclusive manufacturing license to Belle City Malleable Iron Company, similar to its license under the anti-creeper contract, and a similar exclusive selling license to Q. & C. Company. After specifying certain obligations thereunder, the contract provided that these licenses "shall in all respects be subject to the terms and conditions of said anti-creeper agreement, so far as the provisions thereof are applicable." Under further provisions of the contract, M. W. Supply Company was also granted a selling license, which, while limited to the Vaughan type of anti-creepers, should "in all other respects, be subject to the terms and conditions of said agreement of April 30, 1907, so far as the same are applicable." The payments to be made by it to Barnett were, however, fully and specifically regulated by the contract itself. Certain royalties were to be paid by Q. & C. Company to the M. W. Supply Company on all sales of the Vaughan device. The right to terminate the interest of Barnett and of his sublicensees for failure to make good any breach of obligation within 30 days after notice thereof was reserved to the M. W. Supply Company.

After enumerating in several paragraphs certain obligations and rights of Barnett and Q. & C. Company, the contract provided as follows: "Fifth. It is further agreed that the terms and conditions of said anti-creeper agreement above referred to, which shall be considered a part of this agreement, so far as applicable thereto, are as follows." Following this, many paragraphs of the anti-creeper contract are copied. But neither therein nor in the license issued by Barnett to Q. & C. Company contemporaneously with and pursuant to the Vaughan contract is any minimum sale or royalty expressly provided, or any right in Barnett to terminate the license for any breach or failure expressly reserved. The contract does, however, provide that, on Q. & C. Company's bankruptcy or cessation of business, its rights should revert to Barnett. There are also references to Barnett's power to grant other licenses.

Contemporaneously with the Vaughan contract, the four corporations, parties to the anti-creeper agreement, and in whom the control and direction of the trustee and of the affairs of the joint enterprise were thereby vested, entered into a contract, referred to as the "assenting agreement," which, after reciting that they had directed Barnett to make the Vaughan contract, ratified it, and directed Barnett to grant the Malleable Company an exclusive license to manufacture the Vaughan type of anti-creeper and to sell the same only to the M. W. Supply Company and to the Q. & C. Company and also to grant a selling license to Q. & C. Company "upon the terms and conditions set forth in said (Vaughan) agreement." The assenting agreement, as well as the license to Q. & C. Company, issued pursuant thereto, instead of providing, as did the anti-creeper contract, in terms for a royalty, specified that "the net profits derived from all sales of the said Vaughan type of anti-creeper, after paying the royalties provided in said agreement, shall be divided as follows, to wit: To the Q. & C. Company, one-third; the remaining two-thirds to be distributed among the other" companies in certain named proportions.

In 1913 the parties to the assenting contract of 1909 entered into another agreement, whereby the agreements of 1907 and 1909 and the licenses were substantially modified. Q. & C. Company thereby released all of its license rights to sell any of the old devices other than the Vaughan type. The $30,000 minimum royalty imposed under the 1907 agreement and license was reduced to $25,000, with the provision that "so long as the Q. & C. Company shall sell hereunder anti-creeper devices during each calendar year, in such quantity that the royalties thereon shall amount to $25,000 or more, such sales shall constitute a compliance by the Q. & C. Company with the provisions of said contract and license regarding minimum sales." This contract further

gave Q. & C. Company an option on a license for new devices that the parties might acquire which, when granted, should be subject to termination on 30 days' notice for failure to reach a specified minimum of sales, "provided, however, that nothing herein contained shall in any way modify the trustee's right to terminate said the Q. & C. Company's license rights in case said the Q. & C. Company shall fail to pay to said trustee not less than $25,000 royalties accrued on the total sales of all types of anti-creeping devices sold by said the Q. & C. Company during every calendar year." The contract further gave Q. & C. Company the right to terminate it and all of its rights and obligations under the anti-creeper agreement as modified and under any licenses granted pursuant thereto at any time, on giving 30 days' notice, expressly exempted it from any obligation actually to pay the minimum royalty, but provided that, "in case of its failure to pay such minimum royalty on sales for any one year, the trustee shall have the option of terminating said Q. & C. Company's license rights in the manner specified in paragraph twelfth of said agreement of April 30, 1907."

On February 1, 1914, all of the parties interested in the sales of the Vaughan device—that is, M. W. Supply Company, Q. & C. Company, and the other three beneficiaries of the Barnett trust—entered into the so-called promotion contract, whereby they agreed that out of the gross profits and royalties received by them from all sales of said device from and after January 31, 1914, over and above 1,000,000, but not exceeding the next million, to railroads other than the Pennsylvania, they should contribute to an advertising and promotion fund in specified sums per anchor, aggregating 2½ cents, and thus producing $25,000 on such second million. Q. & C. Company, however, was to make the advances in the first instance. Any excess of advances over receipts was to be shared by the M. W. Supply Company. Contribution by the others of their proportional amounts was to be made only after they had actually received their profits and royalties.

On December 31, 1914, Barnett, as trustee and also as licensee, served notice on Q. & C. Company of the termination of its rights under all licenses granted by him pursuant or subject to the terms of the 1907 agreement, for failure to make sales in the year 1914 which would yield royalties, payable to him, of not less than $25,000, as provided in the anti-creeper agreement as amended by the 1913 contract. After two extensions without prejudice had been granted, Barnett, on April 1, 1915, gave a selling license to P. & M. Company, which had knowledge of all the facts, and which had theretofore been licensed by Barnett, with the consent of all parties, to sell a rival anchor.

Thereupon the Q. & C. Company filed its bill in equity against the parties to each of the agreements, Barnett and the P. & M. Company, setting up the above-recited facts and documents to the end that the cancellation notices might be declared null and void, the license to the P. & M. Company annulled, and the parties enjoined from acting thereunder or interfering with its rights under the licenses. Based upon certain allegations of mutual mistake in accountings theretofore had, the bill also prayed a reaccounting and reimbursement. The case is before us on appeal from a decree overruling a motion to dismiss, and, on failure to answer, permanently enjoining defendant Barnett from in any manner treating the Q. & C. Company's rights as selling licensee of Vaughan devices as having been canceled or terminated by or under the notice of December 31, 1914, or for any default or claimed default occurring prior to the decree and enjoining the P. & M. Company from exercising any rights in respect to Vaughan devices under the license of April 1, 1915. All questions in reference to the accounts, both past and future, were expressly reserved.

Otto R. Barnett and Edward B. Burling, both of Chicago, Ill., for appellants.

D. S. Wegg and Walter H. Chamberlin, both of Chicago, Ill., for appellee.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

MACK, Circuit Judge (after stating the facts as above). While the parties have presented, both in briefs and in oral arguments, their respective contentions as to the true construction of the several agreements, we deem it unnecessary for the purposes of this case to determine whether the minimum royalty and termination provisions of the anti-creeper contract became a part of the Vaughan contract and license, or whether either by reason of the express incorporation therein of certain other parts of the earlier contract or because of the M. W. Supply Company's interest in having the Q. & C. Company act as licensee under the Vaughan patents, these provisions must be deemed to be excluded therefrom. Nor do we find it necessary to consider whether or not the forfeiture provisions of the 1913 agreement, to which Vaughan and the M. W. Supply Company were not parties, are null and void in so far as they attempt thus to regulate appellee's rights under the Vaughan contract and the license issued pursuant thereto, or whether or not, in view of the further provision that the 1913 agreement should be considered solely as a modification of the 1907 agreement and license, the forfeiture provisions are to be limited to the optional rights under new inventions and to those conferred under the 1907 license, and in that event whether or not the 1909 license would enable appellee to sell the Vaughan device if it infringed any of the basic patents transferred to Barnett as trustee in 1907. Nor do we determine whether or not the royalties payable by appellee to the M. W. Supply Company can be added to the moneys payable to Barnett as trustee, in making up the $25,000 minimum.

[1] For, assuming the contentions of appellants as to each of these matters to be sound, and that as a result thereof and but for the promotion contract of 1914, Barnett as trustee would have had the right to terminate all of appellee's licenses under the notices of December 31, 1914, inasmuch as Barnett's total earnings on appellee's sales in the year 1914 were less than $15,000, we are of the opinion that the promotion contract operated either by implied agreement or by waiver to modify the earlier contracts, so as to suspend the right of forfeiture thereunder for failure to earn the minimum royalty until the 2,000,000 devices should have been sold.

That this is the true intent and meaning of the promotion contract is apparent from its provisions whereby, while appellee was bound to make the advances up to $25,000, its right of reimbursement to the extent of $10,000 from the other beneficiaries was dependent upon the sales of the second million devices. On December 31, 1914, the first million had not been sold; if appellee could then have been deprived of its selling rights, it would have been completely at the mercy of the other parties for the amount advanced by it on their purely conditional obligation to repay; if they should thereafter confine the sale of the Vaughan device to the Pennsylvania road or push the P. & M. Company's or any other anchor, the contingent obligation might never become absolute; appellee would be disabled not only from reaping the fruits of its own share of the promotion expenses, but also from assisting the others to earn the fund out of which alone its claim was payable. Nor can the other parties to the promotion contract now urge that appellee was obligated under the Vaughan contract and li-

cease to advertise and push the sale of this device. No breach of this provision has ever been charged against appellee. The parties evidently believed that, notwithstanding appellee's full performance of this duty, further and costlier promotion schemes than could have been demanded from appellee alone would be to their joint advantage.

It is clear that, in view of the heavy competition of the P. & M. Company's device for several years past, the parties had in mind the possibility of decreased sales in 1914 and were endeavoring by the extra expenditure to obviate this and to build a better foundation for large future profits. While the promotion contract does not in express terms waive the minimum sales requirement, the fact that contrary to the first draft thereof, under which the 2,000,000 devices were to be sold within one year, the final agreement fixes no time limit whatever for their sale, clearly evidences an intent and purpose, on which appellee had a right to rely, that it could continue the sale of the Vaughan devices exclusively, except only as to the M. W. Supply Company and, in any event, until the 2,000,000 should have been sold.

[2] A reserved right of forfeiture for breach of an obligation may be waived before breach by an act or declaration inducing the licensee to continue in the performance of its obligations and upon which it was reasonably justified in relying as showing an intent to suspend the exercise of the right. Whether, therefore, the promotion contract implicitly, but by agreement, and on the considerations therein expressed, modified the earlier agreements, or merely waived the beneficiaries' right, if any, thereunder, to direct the termination of the licenses, it sufficed to prevent a forfeiture for failure to make the minimum sales during the year 1914 and until the 2,000,000 devices should have been sold.

That Barnett was not a party to the promotion contract is immaterial. While he had certain active duties as trustee, he had no beneficial interest in the matter, and was at all times expressly subject to the control and direction of the beneficiaries. His termination notices state that they were given, as under the contract they needs must have been given, pursuant to the directions of his beneficiaries. Inasmuch, however, as they had waived the right of termination, their direction and his notices pursuant thereto must be deemed to be of no legal effect.

It is contended that inasmuch as the Vaughan contract of 1909, while providing for an exclusive selling license to appellee, not only also provides for a selling license to M. W. Supply Company, but refers to Barnett's power to grant other licenses, and inasmuch as the 1909 license from Barnett to appellee is not expressed to be exclusive, the license of April 1, 1915, to P. & M. Company was properly issued. The several clauses of the 1909 agreement are, however, readily reconcilable on the only fair and reasonable interpretation that appellee's license was to be exclusive except only as to Vaughan's prior licensee, M. W. Supply Company, and that Barnett's power to grant other licenses is exercisable only if appellee's license should revert to him as provided in the agreement; that is, on appellee's bankruptcy or cessation of business. The new license to P. & M. Company must therefore be held to have been wrongfully issued.

[3] The remedy at law for damages is entirely inadequate. The modified exclusive license under a patent is a unique property right, against the destruction of which a court of equity will give protection by injunctive relief. That appellee had an option under the 1913 agreement to surrender its license does not bar its remedy in equity. As was said by the Supreme Court in Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856, in reference to a similar defense interposed to a suit in equity by an oil and gas lessee against his lessor and a subsequent lessee with notice:

"This is not a suit for specific performance. Its purpose is not to enforce an executory contract to give a lease, or even to enforce an executory promise in a lease already given, but to protect a present vested leasehold. * * * We think this option, which has not been exercised and may never be, is not an obstacle to the relief sought."

The decree must therefore be affirmed.

### On Petition for Rehearing and Modification of Decision.

On this motion, attention is for the first time directed to the fact that the decree expressly continues the temporary injunction in force. Inasmuch as the permanent decree gives the complainant all of the injunctive relief to which it is now entitled, the broader temporary injunction should not have been continued but dissolved.

The ambiguity which counsel find in the statement that the promotion contract operated to suspend the right of forfeiture for failure to earn the minimum royalty until the 2,000,000 devices should have been sold will be avoided, and our views more clearly expressed, by substituting therefor the following:

"We are of the opinion that the promotion contract operated, either by implied agreement or by waiver, to modify the earlier contracts, so as to annul the right of forfeiture thereunder for failure to earn the minimum royalty in the year 1914, or in any succeeding year while the 2,000,000 devices remain unsold."

In other words, the promotion contract did not merely suspend the right of forfeiture temporarily. So far as the claimed right is based on the failure to earn the minimum annual royalty during the year or years in question, it ended it. The court, therefore, properly enjoined Barnett permanently from in any manner treating appellee's rights as terminated by or under the notices of December 31, 1914.

The only danger, other than that resulting from the license to P. & M. Company, alleged in the bill as threatening complainant's right, is that arising out of the claimed forfeiture of the license under the December 31, 1914, notices, in which the sole ground of forfeiture asserted is the failure to earn the minimum royalty in the year 1914. There is no charge that the defendants claim any other breach or default by complainant and no such possible claim is involved in this litigation. Defendants, therefore, should not be debarred by the decree from hereafter making such a claim if they should deem it to be well founded. The decree, in addition to annulling the P. & M. Company license, should be limited to restraining the defendants from giving effect to these notices.

That portion of paragraph numbered "3" of the decree which, after enjoining the defendants from treating complainant's license as terminated by the December 31, 1914, notices, adds, "or in any manner canceled or terminated for any default or claimed default upon the part of said complainant which has heretofore occurred," should be stricken out.

The opinion heretofore filed will be amended as indicated. The decree of the District Court will be modified, by substituting the word "dissolved" for the word "continued" in reference to the preliminary injunctions, and by striking out that part of paragraph numbered "3" hereinabove quoted.

The petition for rehearing is overruled, and the decree, as modified, is affirmed.