UNITED STATES v. GENERAL DYE-STUFF CORPORATION et al.

District Court, S. D. New York.

Nov. 6, 1944.

Herbert A. Berman and Patrick A. Gibson, Sp. Assts. to Atty. Gen., and Wendell Berge, Asst. Atty. Gen., for plaintiffs.

Garey, Desvernine & Garey, of New York City (Raoul E. Desvernine, Jacob J. Rosenblum, and A. J. Nydick, all of New York City, of counsel), for defendant Dietrich A. Schmitz.

John J. Burns, of New York City, and John F. Rich, of Boston, Mass., for defendant General Dyestuff Corporation.

RIFKIND, District Judge.

Defendants demur to the indictment and move to quash it. The indictment is in two counts. The first charges a violation of Section 1 of the Anti-Trust Act, Act of July 2, 1890, 26 Stat. 209, 15 U.S.C.A. § 1; the second charges a violation of Section 73 of the Wilson Tariff Act, Act of August 27, 1894, c. 349, 28 Stat. 570, 15 U.S. C.A. § 8.

Under count 1 the indictment charges that:

"Beginning on or about May 14, 1924, and continuing at all times thereafter including the three years next preceding the date of the filing of this indictment, the defendants and co-conspirators named herein, and other persons to the Grand Jury unknown, well knowing all the facts alleged herein, have been engaged in the United States and within the Southern District of New York in a wrongful and unlawful combination and conspiracy in restraint of interstate and foreign trade and commerce in dyestuffs and heavy chemicals in violation of Section 1 of the Act of Congress of July 2, 1890, as amended, entitled 'An Act to Protect Trade and Commerce against Unlawful Restraints and Monopolies,' commonly referred to as 'The Sherman Act,' that is to say:

"The defendants and co-conspirators named herein, and other persons to the Grand Jurors unknown, beginning on or about May 14, 1924, to and including the date of the filing of this indictment, have been continuously engaged in an unlawful combination and conspiracy formed in part and carried out in part in the Southern District of New York, to unreasonably restrain, suppress, and limit competition in the production, manufacture, distribution, and sale of dyestuffs and heavy chemicals in interstate and foreign trade and commerce. Pursuant to said unlawful conspiracy defendants agreed that:

"a. General Aniline Works, and subsequently defendant General Aniline would confine its manufacture of dyestuffs to the United States and would not export dyestuffs from the United States, and would not manufacture heavy chemicals in the United States.

"b. Defendant I. G. Farben would not manufacture dyestuffs in the United States, and would not export dyestuffs to the United States, except through defendant General Dyestuff.

"c. Defendant I. G. Farben and co-conspirator General Aniline Works, and subsequently defendant General Aniline would not market dyestuffs in the United States except through defendant General Dyestuff.

"d. General Aniline Works, and subsequently defendant General Aniline, would not compete with I. G. Farben in the manufacture of dyestuffs for sale in the United States.

"Said unlawful combination and conspiracy has been effectuated and furthered by divers means and methods, including, among others, the following:

"During May and June 1924 a series of agreements were entered into between The Grasselli Chemical Company and Bayer which in substance provided:

"a. The Grasselli Chemical Company and Bayer agreed to combine their entire dyestuff interests in the United States into a jointly owned and controlled company to be called Grasselli Dyestuff Corporation.

"b. Bayer and The Grasselli Chemical Company agreed that during the corporate existence of Grasselli Dyestuff corporation neither Bayer nor the Grasselli Chemical Company would manufacture, sell, or deal in dyestuffs in the United States, or invest in or support, directly or indirectly, any other company, organization or individual engaged in the manufacture or sale of dyestuffs in the United States.

"c. The Grasselli Chemical Company conveyed all of its dyestuff properties, inventories, and rights to manufacture dyestuffs in the United States and Canada to Grasselli Dyestuff Corporation.

"d. Bayer granted to Grasselli Dyestuff Corporation the sole and exclusive right to manufacture, import, and sell, in the United States and Canada, all dyestuffs manufactured, sold, or dealt in by Bayer.

"e. Grasselli Dyestuff Corporation agreed to confine its manufacture and sale of dyestuffs to the United States and Canada, agreed not to export dyestuffs therefrom, and agreed not to enter into the

manufacture and sale of heavy chemicals in the United States.

"On or about July 31, 1925, the Nine Manufacturers were made parties to the agreements between Bayer and The Grasselli Chemical Company, referred to in paragraph 38 of this indictment.

"On or about December 1, 1925, Badische became a party to the agreements referred to in paragraphs 38 and 39 of this indictment.

"On or about March 28, 1925, defendant General Dyestuff was formed as an exclusive dyestuff sales agent in the United States for Bayer and Grasselli Dyestuff Corporation. Thereafter, and to the date of the presentation of this indictment, defendant General Dyestuff has acted as the exclusive selling agent for defendants I. G. Farben and General Aniline in the United States. Defendants General Aniline and I. G. Farben have refused to sell dyestuffs except through defendant General Dyestuff.

"On or about January 1, 1926 defendant I. G. Farben ratified the agreements referred to in paragraphs 38 through 40 of this indictment, and assumed, and at all times subsequent thereto performed, the obligations under these agreements of Badische, Bayer, and the Nine Manufacturers.

"On or about October 30, 1939, defendant General Aniline absorbed General Aniline Works, Inc., formerly Grasselli Dyestuff Corporation, and assumed, and at all times subsequent thereto performed, all of the obligations of General Aniline Works, Inc., under the agreements referred to in paragraphs 38 through 40 of this indictment.

The grounds of the demurrer, in the order in which they appear in the brief of defendant Schmitz, are as follows:

1. The agreements between the defendant and the co-conspirators were lawful and did not constitute a combination or conspiracy in restraint of trade within the meaning of § 1 of the Sherman Act because (a) the agreements restricting competition were the usual negative covenants attending the sale of a business; (b) agreements which have no other effect than to eliminate competition between the parties thereto do not violate § 1 of the Sherman Act; (c) the elimination of competition was a natural and necessary consequence of the integration of the various interests of the defendants and the co-conspirators; or, as more fully stated in the reply brief, the relationship between I. G. Farben and General Aniline was that of parent and subsidiary; and (d) the alleged combination or conspiracy neither directly, substantially or unreasonably restrained competition in dye stuffs and heavy chemicals in interstate or foreign commerce.

2. The appointment by the parties of General Dyestuff Corporation as the exclusive distributor of their dyestuffs was not a violation of the Anti-Trust laws.

I shall consider each of these points in the same order.

1-a. It is unnecessary, for purposes of decision here, to examine the law relative to permissive restraints ancillary to the sale of a business. Granting that some restraints of that character are enforceable between the parties and afford no basis for criminal prosecution, United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 46 L.R.A. 122, affirmed, 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, it is sufficient answer that this indictment does not pretend to charge such conduct as a violation of the law. It does charge that the defendants and co-conspirators have been continuously engaged in an unlawful combination and conspiracy to unreasonably restrain, suppress and limit competition in the production, manufacture, distribution and sale of dye stuffs and heavy chemicals in interstate trade and foreign commerce. The several agreements entered into among the parties are alleged to have been made pursuant to the unlawful conspiracy. Even if we assume that the agreements when severed from their alleged purpose and object were lawful, it does not follow that, as means to the attainment of an unlawful end, they may not be condemned as part of the prohibited combination and conspiracy.

The crime is the conspiracy, Nash v. United States, 1913, 229 U.S. 373, 33 S. Ct. 780, 57 L.Ed. 1232. The means do not qualify the charge of conspiracy, Jelke v. United States, 7 Cir., 1918, 255 F. 264, and need not be proved as alleged, United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 250, 60 S.Ct. 811, 84 L.Ed. 1129. In other words, the indictment does not charge a violation of law by reason of the annexation of restraints on competition as ancillaries to the sale of a business but rather does charge the viola-

tion of law by reason of a principal agreement or conspiracy unreasonably to restrain competition, executed by means of conveyances with restrictive covenants annexed.

■ It has long been established that the legality of the means selected to effectuate an unlawful purpose does not immunize those engaged in the conspiracy to accomplish it. United States v. Trans-Missouri Freight Ass'n, 1897, 166 U.S. 290, 329, 17 S.Ct. 540, 41 L.Ed. 1007, applies the general rule to the type of situation involved in the instant case. To the same effect is United States v. Addyston Pipe & Steel Co. supra, 85 F. at page 282, where the Circuit Court said:

"But where the sole object of both parties in making the contract as expressed therein is merely to restrain competition, and enhance or maintain prices, it would seem that there was nothing to justify or excuse the restraint, that it would necessarily have a tendency to monopoly, and therefore would be void. In such a case there is no measure of what is necessary to the protection of either party, except the vague and varying opinion of judges as to how much, on principles of political economy, men ought to be allowed to restrain competition. There is in such contracts no main lawful purpose, to subserve which partial restraint is permitted, and by which its reasonableness is measured, but the sole object is to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster."

In Thoms v. Sutherland, 3 Cir., 1931, 52 F.2d 592, 593, the court said:

"The validity of the contract turns on two principles of law—recognized by all parties—one, that where the purpose of a contract is unreasonably to restrain trade, and other covenants, though valid in themselves, are but incidental to that purpose, the contract is void; the other, that where the purpose of a contract is the sale of a business, and a restrictive covenant as to territory is but ancillary to that legitimate purpose and necessary for the protection of property rights which pass from one to another, the contract is valid."

It follows that this first ground assigned by defendants is without substance because it is not germane to the indictment found.

1-b. This argument is spelled out more fully by the defendant thus: Nothing more is alleged in the indictment than that the parties agreed not to compete in certain respects, that they made a series of contracts which contained such provisions not to compete and that the effect of their agreements was that they did not compete. It is asserted by the defendants that the Supreme Court has categorically held that such agreements between parties, which have no other result than to affect or eliminate competition between them, are not violative of the Sherman Act. The authority relied on for this startling declaration is the Appalachian Coals Case (Appalachian Coals, Inc. v. United States, 1933, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825), where the court said, at page 360 of 288 U.S., at page 474 of 53 S.Ct., 77 L.Ed. 825:

"The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it."

But it is unnecessary to cite authority for the proposition that there is danger in converting a sentence taken out of context into a maxim. Read in its setting the quoted sentence does no more than to restate an old truism. Indeed, the very next sentence makes the court's intention clear, for it quotes from Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, the following language:

"The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains."

■ It would indeed be strange if by the repetition of such ancient wisdom the Supreme Court intended to blaze a new trail in the law and, in effect, to announce that the Sherman Act was not designed to proscribe the suppression of competition. I find no such new departure in the Appalachian Coals case; and all the evidence of the more recent decisions of the Supreme Court points in the opposite direction, indicated by Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 244, 20 S.Ct. 96, 108, 44 L.Ed. 136, where the court said:

"We have no doubt that where the direct and immediate effect of a contract or combination among particular dealers in a commodity is to destroy competition between them and others, so that the parties to the contract or combination may obtain increased prices for themselves, such con-

tract or combination amounts to a restraint of trade in the commodity, even though contracts to buy such commodity at the enhanced price are continually being made."

Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed. 1129; Fashion Originators Guild of America v. Federal Trade Commission, 1941, 312 U.S. 457, 465, 61 S.Ct. 703, 85 L.Ed. 949; Interstate Circuit v. United States, 1939, 306 U.S. 208, 230, 59 S.Ct. 467, 83 L.Ed. 610. These recent cases follow the precedents well established in American Column Co. v. United States, 1921, 257 U.S. 377, 400, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093; Northern Securities Co. v. United States, 1904, 193 U.S. 197, 337, 24 S.Ct. 436, 48 L.Ed. 679; United States v. Union Pac. R. Co., 1912, 226 U.S. 61, 87, 33 S.Ct. 53, 57 L.Ed. 124; and see Zlinkoff, Monopoly Versus Competition, 1944, 53 Yale Law Journal, 514, 525. The cases unite upon the proposition that the purpose of the Sherman Act was to preserve the competitive system and to confer both public and private remedies against conspiracies and agreements for the restriction or suppression of competition.

■ The reasoning which has resulted in the rule that price fixing agreements are invalid per se springs from the fact that such agreements eliminate competition. Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852. The primary evil is the suppression of competition. Price fixing is condemned because it invariably leads to that evil. The rule of reason, the rule permitting restraining covenants ancillary to a sale, and similar rules are moderating forces upon the common law doctrine which permitted few, if any, formulae of justification for agreements restraining trade. Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 51, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734. But it is one thing to permit justification; it is another to argue, where by hypothesis the suppression of competition is without justification, since it is the end in itself, that the restraint is lawful. This would destroy the rule which would be devoured by the exception. Nordenfelt v. Maxim Nordenfelt Guns & Ammunition Co., 1894, App. Cas. 535, 565, affirming, 1893, 1 Ch. 630.

■ Moreover, by the agreements alleged to have been the means of executing the conspiracy, I. G. Farben and General Aniline effected a territorial division, one of the traditional arrangements condemned under the Sherman Act. Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 497, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 241, 20 S.Ct. 96, 44 L.Ed. 136; Butchart v. United States, 9 Cir., 1924, 295 F. 577, 579. That the division of territory was on a continental basis rather than on a more modest scale can hardly be said to mitigate the offense.

■ The alleged agreements likewise suppressed General Aniline's export trade. Defendant argues that the only effect of that was to deprive the people of foreign nations of General Aniline's competition. But that is no answer to the policy implemented by the Sherman Act which forbids conspiratorial restraints on foreign commerce, as well as on domestic interstate commerce. And certainly no restraint can be more effective than one which completely suppresses. Bindrup v. Pathe Exchange, 1923, 263 U.S. 291, 312, 44 S.Ct. 96, 68 L.Ed. 308.

■ 1–c. The indictment does not allege that General Aniline is a subsidiary of I. G. Farben; nor does it allege facts from which such an inference must be drawn. It does allege that I. G. Farben has controlled the policy of General Dyestuff and General Aniline "by means of various understandings and agreements." On demurrer the court cannot assume a fact not alleged even if a jury would be justified in drawing such a fact as inference from the other allegations when proved. Only if no other inference were possible would the court be justified in treating the indictment as alleging the inferred fact. The instant indictment does not allege a parent-subsidiary relation between I. G. Farben and General Aniline. The Grand Jury charges that the defendants have endeavored to conceal the beneficial ownership of General Aniline and, in effect, that it does not know who in truth owns General Aniline. Under the indictment as framed, if the defendants rely upon a parent-subsidiary relationship as a defense, they will have to prove it.

648

■ 1-d. This argument is based on the assumption that a reading of the indictment discloses no pre-existing competition between the corporations who agreed not to compete, and from that, the argument is advanced that suppression, if any, was that of non-existent competition which is not violative of law. International Shoe Co. v. Federal Trade Commission, 1930, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431. That case was concerned with § 7 of the Clayton Act, 15 U.S.C.A. § 18, and not with § 1 of the Sherman Act. Even if the indictment were to be read as the defendants read it, the point would still be without merit.

The rule under the Sherman Act is as stated in United States v. United Shoe Machinery Co., 1918, 247 U.S. 32, 53, 38 S.Ct. 473, 480, 62 L.Ed. 968, to the effect that:

"Neither the letter of the law nor its purpose 'distinguishes between strangling a commerce which has been born and preventing the birth of a commerce which does not exist.'"

Relevant hereto are the allegations of the indictment that:

"I. G. Farben is the largest manufacturer of dyestuffs in the world * * *. A large proportion of the dyestuffs manufactured by it has been sold and shipped throughout the world, a substantial proportion having been shipped to the United States * * *. General Aniline is one of the largest manufacturers of dyestuffs in the United States, manufacturing about 20 percent of the dyestuffs manufactured and sold in the United States."

■ True, the Sherman Act "does not compel competition, nor require all that is possible." United States v. United States Steel Corp., 1920, 251 U.S. 417, 451, 40 S. Ct. 293, 299, 64 L.Ed. 343, 8 A.L.R. 1121. But it does forbid the suppression of competition by conspiracy or agreement. United States v. Reading Co., 1912, 226 U.S. 324, 369, 33 S.Ct. 90, 57 L.Ed. 243.

■ 2. This argument need not detain us long. I need not decide when, in the abstract, the appointment of an exclusive sales agent is permissible under the Sherman Act. I assume it is permissible. I assume that that act alone, isolated from any unlawful purpose and from an illegal conspiracy, gives no ground for complaint. This indictment, however, charges the exclusive agency jointly serving both I. G. Farben and General Aniline as one of the instruments for the consummation of the conspiratorial and illegal purpose. What has already been said earlier in this opinion concerning the relationship of a lawful means to an unlawful end applies to this argument as well.

Count 2 of the indictment is addressed to § 73, of the Wilson Tariff Act, which provides, in part, as follows:

"Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter. * * *"

What has been said under the first count applies to this count as well, since it is founded on substantially the same allegations and on a statute which makes explicit the prohibitions of the Sherman Act in the field of foreign commerce. Fosburgh v. California & Hawaiian Sugar Co., 9 Cir., 1923, 291 F. 29, 32.

Only two additional arguments are addressed to this count which require brief notice:

■ 1. The defendants contend that by its terms the Wilson Act proscribes only those agreements which are "intended to operate in restraint of lawful trade or free competition," and they suggest that no allegation of intention is to be found in the indictment. The short answer is that the allegation, that the defendants combined and conspired "to unreasonably restrain, suppress, and limit competition * * * in dyestuffs and heavy chemicals in interstate and foreign trade and commerce," is clearly an averment that the combination and conspiracy were intended so to operate. Where, as here, the indictment alleges that the sole purpose of the conspiracy was to restrain and suppress competition, it satisfies the provision of

the statute that conspiracies intended to operate in restraint of competition are outlawed.

The second argument advanced by defendants is that the agreements, designed to keep foreign chemicals from entry into the United States, cannot be deemed to be against public policy because they serve the same purposes as the tariff acts. But the intention of Congress is quite unambiguous. It subjects the imports of foreign commodities to public control and regulation and prohibits such control and regulation by private combination. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 613, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 226, 227, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Borden, 1939, 308 U.S. 188, 197, 198, 60 S.Ct. 182, 84 L.Ed. 181.

No other grounds for the demurrer and the motion to quash were pressed upon the argument or in the briefs. The demurrer is overruled and the motion to quash denied.