**FOUNDRY SERVICES, Inc. v. BENEFLUX CORP.**

United States District Court
S. D. New York.
March 16, 1953.

Glass & Lynch, New York City, by Simon Brett, New York City, for plaintiff.

Cahill, Gordon, Zachry & Reindel, New York City, by John F. Sonnett, Jerrold G. Van Cise and William M. Sayre, New York City, for defendant.

McGOHEY, District Judge.

The plaintiff, a New York corporation, moves for an injunction pendente lite to restrain the defendant, a Delaware corporation, from competing with it in the United States in the sale of certain fluxes and other products used in the manufacture of metal castings. The amount in controversy is adequate for diversity jurisdiction.

The defendant is a subsidiary of Foundry Services, Ltd., an English corporation which owns "certain secret processes, recipes and formulae relating to the manufacture" of the fluxes and other products. In 1934 the English corporation granted to the plaintiff an "exclusive license, liberty and authority to manufacture the said fluxes and other products in accordance with the said secret processes, recipes and formulae and to sell the same within the United States of America and the Dominion of Canada only for a period of five years

from the date hereof and such further period as is hereinafter provided for." The license was granted in an agreement by which the English corporation bound itself during the life of the agreement not to sell the said fluxes and other products or any of them directly or indirectly "in any part of the United States of America or the Dominion of Canada," and the plaintiff bound itself not to "export the said fluxes and other products or any of them to any country other than the United States of America and the Dominion of Canada without the previous consent in writing of the Licensor." There was provision for successive five-year extensions conditioned on the plaintiff's doing an annual business of specified dollar volume, on which it was to pay royalties of 10%. Pursuant to its terms the agreement was continued and it was in effect on October 5, 1951, when the plaintiff received from the English corporation written notice of termination. This was based on a single sale by the plaintiff of about $4 worth of one of the fluxes to a firm in Mexico in the early part of April, 1951.

The circumstances of this sale and the eventual termination of the agreement by the English corporation appear from the complaint and various affidavits to be as follows. Some time in the latter part of March or the early part of April, 1951, the plaintiff received a letter from Conexiones Nacionales S. A. in Monterrey, Mexico, containing a draft for $5 and asking for as much of a certain flux as that amount, allowing for postage, would buy. The plaintiff, on April 6, 1951, in response to this request, forwarded five pounds of flux. On April 9, 1951, the plaintiff wrote the English corporation as follows:

"We have an inquiry from Fundidora de Aceros Tepeyac S. A., Mexico 1, D. F. for a sample quantity of Aluminum Grain Refiner No. 2. This product was recommended to them by Aluminum Company of Canada.

"As you know, we have had a number of other requests from Mexico. In fact, last week another foundry sent us a check for $5.00 to send them a few pounds of No. 190 by air mail.

"I don't know whether you have concluded arrangements for Mexican representation. If not, we can ship either from here or have our Los Angeles representative ship from stock.

"Let me know promptly your views on the above as they are in urgent need."

There was further correspondence in which the plaintiff advised the English corporation of another inquiry from a Mexican firm. The English corporation, which did not then have a representative in Mexico, requested to be advised of all such inquiries in order to make them available to representatives it was "planning" to appoint in Mexico. It also requested, in August, 1951, "particulars of the enquiry from the foundry who sent you a cheque for $5.00 for Degaser 190. Will you please advise so that we can follow up." The plaintiff replied to this on September 4, 1951, by quoting the foregoing letter of March 7, 1951 from Conexiones Nacionales S. A. and stating that it, the plaintiff, had in response thereto "sent them five pounds of DeGaser #190." On October 5, 1951, a New York attorney delivered to the plaintiff a letter dated September 21, 1951 from the English corporation, in which the plaintiff was informed that its sale to Conexiones Nacionales S. A., being without consent of the English corporation, "infringes paragraph No. 6 of our agreement of 18th June, 1934. We therefore give herewith formal notice that the above agreement is terminated under paragraph No. 16."

The plaintiff replied by letter of October 8, 1951, stating that it believed the termination of the agreement to be unjustified under all the circumstances and that it would "regard such agreement as continuing in full force and effect." It seems that thereafter the English corporation considered the agreement terminated but it does not appear that it immediately began to sell its

fluxes in the United States.[1] In or about October, 1952, however, the defendant was organized in Delaware as a subsidiary of the English corporation which then sent over one of its employees, George W. Burger, who on October 24 became Vice President of the defendant. According to his affidavit, he began on November 3 to call on prospective purchasers of the fluxes and allied products produced according to the identical secret processes, recipes and formulae which are the subject of the 1934 agreement. Some of those he called on are customers of the plaintiff. The complaint in this action was filed on February 2, 1953. It seeks temporary and permanent injunctive relief and damages of half a million dollars.

Full inquiry at a trial into the prior relations of the plaintiff and the English corporation may disclose a course of conduct between them which would have justified the plaintiff in believing, as it claims it did, that it was quite permissible and indeed appropriate for it to send the sample to Mexico as an aid to the English corporation in its expected follow-up to effect substantial sales through its own efforts. From such facts as now appear, it seems most unrealistic as well as unreasonable to magnify this isolated transaction into a "disturbing sale," "untimely and deliberate," which interfered with the English corporation's reserved right to exploit the Mexican market in its own way. Indeed for all we now know, it may well have been a help. Moreover, the plaintiff's good faith is demonstrated by its prompt letter to England concerning the receipt of $5 for a sample of flux and its prompt communication of other inquiries from Mexican firms. It is urged that the plaintiff's letter of April 9, 1951 did not in terms inform the English corporation that a sample actually had been forwarded to Mexico. This is quite true.

But it can't seriously be argued that this circumstance evidences deliberate suppression of facts by the plaintiff or that the English corporation was misled. It is only reasonable to believe that when the plaintiff promptly reported receiving the "check for $5 to send them a few pounds of No. 190 by air mail" the English corporation certainly understood that the money had not been just pocketed but that the material requested had been sent.

■ The plaintiff during the almost twenty years the agreement has existed has built up a valuable business. It maintains an office in Manhattan and a factory in Brooklyn. Its products are sold under a registered and advertised trademark. The dollar volume of its sales during the last five years has risen from about $78,000 in 1948 to about $186,000 in 1952. There can be no doubt that this Court has discretion to stay, pending trial, the immediate forfeiture of such valuable rights when that extremely harsh result is sought to be justified by no more than a single and at worst technical transgression which a trial may show to be not even that.[2] It is, of course, true that the trial court might find the $5 transaction to be a substantial breach and sufficient to justify termination of the agreement. But if so it might, and I think it clearly could, also find that such breach came "to the knowledge of the Licensors" through the plaintiff's letter of April 9, 1951 which was obviously received some time before April 21, 1951, the date on which it was acknowledged. With such a finding, the licensors' declaration of termination in their letter dated September 21, 1951 would be ineffective to accomplish that result because it would not have been made "within fourteen days after * * * any breach by the Licensees of the provisions and stipulations on their part herein contained shall have come to the knowledge of

1. Some time in 1951 the parties had modified their relations as to Canada. The plaintiff gave up its licensee rights there in exchange for 49% of the stock of the English corporation's Canadian subsidiary which thereafter sold the fluxes in Canada.

2. Carr v. Jaeger Machine Co., 7 Cir., 69 F.2d 434; Maison Dorin S. A. v. Arnold, 2 Cir., 296 F. 387, certiorari denied 273 U.S. 766, 767, 47 S.Ct. 571, 71 L.Ed. 881; Barnett v. Q. & C. Co., 7 Cir., 226 F. 935; New York Phonograph Co. v. Edison, 136 F. 600, affirmed 2 Cir., 144 F. 404.

the Licensors * * *." [3] Furthermore it is an open question, on the papers before me, whether the declaration of termination was timely even if it be assumed that the alleged breach did not come "to the knowledge of the Licensors" until they received the plaintiff's letter of September 4, 1951. The letter dated September 21 purporting to terminate the agreement states that the plaintiff's September 4 letter "was received here" by the licensors on September 8, that is, thirteen days prior to the date of the letter purporting to declare the termination. The licensors' letter dated September 21 does not prove itself. It was not mailed to the plaintiff, and was not received by the plaintiff until October 5, when an attorney in New York personally delivered it. If the conduct of one party to an agreement is to be judged according to a strict construction of the agreement, the other party's must be also.

▮ From all that has been said up to now it seems to me that the Court's discretion should be exercised so as to maintain until a full inquiry can be had by trial, the relationship and status which existed between the parties prior to the alleged termination of the agreement. Accordingly, the motion would be granted without more but for the defendant's vigorously pressed argument that the agreement is wholly void and unenforceable.

The defendant asserts with great earnestness that the 1934 agreement was from its inception an "international cartel agreement" which violates our antitrust laws by dividing the world's markets between "two competitors." But it is to be noted that in 1934 the English corporation and the plaintiff were in no sense competitors in respect to these fluxes and never had been. Moreover, it is not even suggested that they were or ever had been competitors in any

other field either. The English corporation, being then the sole owner and possessor of its "secret processes, recipes and formulae," had no competitor whatever as to them or as to fluxes made in accordance with them. It could make disclosures or not; sell or not; as it pleased and the public had no legal interest whatever in that choice.[4] And we do not have here, as the defendant suggests, the creation of a "new industry" by the development of secret formulae, as was the situation in U. S. v. General Electric Co.[5] There separate and actually competing companies simultaneously developed and patented related processes which they then pooled and, by a mutually accommodating division of territories, seized control of the world's markets which they thereafter dominated completely, both as to supply and price; and not only in the "hard metal compositions" made according to the processes but also in the "products containing such compositions," such as cutting tools. The use of the fluxes here involved certainly did not create a new industry. They are no doubt good and valuable, but it is not even suggested that they are the only ones available or in use in the manufacture of metal castings.

▮ It is still the law that restraints to be unlawful must be unreasonable.[6] No case cited by the defendant declares unlawful, in itself, an isolated agreement of mutual restraint as to territory only, between a single owner-licensor of a secret process and a single licensee not theretofore in competition with each other. There was no attempt to control the price of these fluxes or to control the distribution or price of products made through their use. It is not shown or even claimed that this license agreement was used either alone or in combination with related agreements to achieve a monopoly in the business of fluxes

3. Par. 16 of the Agreement, Ex. A of the complaint.

4. Board of Trade of City of Chicago v. Christie Grain & Stock Co., 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031.

5. D.C., 80 F.Supp. 989. See also U. S. v. United Shoe Machinery Co., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 698, and U. S.

v. General Dyestuff Corp., D.C., 57 F. Supp. 642.

6. U. S. v. Yellow Cab Co., 332 U.S. 218–227, 67 S.Ct. 1560, 91 L.Ed. 2010; Standard Oil Co. of New Jersey v. U. S., 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; U. S. v. Bausch & Lomb Optical Co., D.C., 45 F.Supp. 387; affirmed 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024.

generally or in any other industry. We have here only the usual covenant by an owner-licensor of a secret process not to compete with its single licensee in the assigned area and to be free from the latter's interference elsewhere. These restraints, clearly only ancillary to a valid primary purpose,[7] are precisely of the kind consistently permitted at common law. In the Standard Oil case[8] the Supreme Court pointed out "that the statute did not forbid or restrain the power to make *normal and usual contracts* to further trade by resorting to all *normal methods,* whether by agreement or otherwise, to accomplish such purpose."[9] [Emphasis supplied.] And so it held that the Sherman Act must be construed "to prevent that act from destroying all liberty of contract and all substantial right to trade," and to prevent that act from "annihilating the fundamental right of freedom to trade which, on the very face of the act, it was enacted to preserve * * *."[10] Exclusive agreements are not per se unlawful.[11] The exclusive license agreement of the type here attacked is probably as old, as "normal," as "usual" and indeed as necessary as any type of contract "to further trade" in use among civilized men.

■ The defendant argues that in a series of recent cases[12] this District Court "Brushing aside argument based upon old decisions involving secret processes, patents and trade marks * * * has repeatedly condemned * * * all divisions of markets between competitors." But in those cases and the others of similar tenor, like Timken Co. v. U. S.,[13] cited by the defendant, it was found that the defendants in fact and by definition were true competitors; and that as such they combined, conspired to and actually did divide the world's markets and thereby suppressed competition among not only themselves but others as well. Accordingly, it was necessarily held that those conspiracies were unlawful; and that they were none the less so merely because of the circumstance that they were effected through license agreements. There was no holding, however, that the license agreements of themselves and apart from the combination were illegal. But we have no comparable situation here. Competition "is a battle for something that only one can get; one competitor must necessarily lose."[14] And so it is quite inaccurate to say that the English corporation was in 1934, or since, a "competitor" of the plaintiff which it merely engaged and authorized to exploit its secret processes in North America. Actually the plaintiff was no more than the English corporation's agent or representative here. And common sense and justice, as well as the "normal" and "usual" business custom of rational men, dictate that a principal refrain from undertaking to perform at the same time and in the same place the precise functions it has engaged a representative to perform. This is especially so and indeed imperative where, as here, the representative's compensation can come only from what it is able to earn through its own efforts as a pioneer in exploiting its principal's secret

7. U. S. v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Thoms v. Sutherland, 3 Cir., 52 F.2d 592; see U. S. v. Bausch & Lomb Optical Co., note 6 supra.

8. Standard Oil Co. v. U. S., note 6 supra.

9. American Tobacco v. U. S., 221 U.S. 106, 179, 31 S.Ct. 632, 648, 55 L.Ed. 663.

10. Same, 221 U.S. at page 180, 31 S.Ct. at page 648.

11. U. S. v. Yellow Cab Co., note 6 supra, 332 U.S. at pages 218, 229, 67 S.Ct. 1560; Federal Trade Comm. v. Sinclair Co., 261

U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746; Donovan v. Pennsylvania Co., 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192.

12. U. S. v. National Lead, D.C., 63 F. Supp. 513, 523, affirmed 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; U. S. v. Imperial Chemical Industries, D.C., 100 F. Supp. 504, 592.

13. 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199.

14. Sinclair Refining Co. v. Federal Trade Commission, 7 Cir., 276 F. 686–688, affirmed 261 U.S. 463, 43 S.Ct. 450, 67 L. Ed. 746.

processes.[15] A holding that, in the circumstances of this case, this agreement violates our antitrust laws would go far beyond, and as I understand the decisions, would clearly not be justified by the teaching of the cases the defendant relies on. It is argued that the tendency of recent decisions is in that direction. However that may be, I think they have not yet gone so far as to establish the extreme proposition the defendant asserts. And so, in the absence of a clear ruling to the contrary, I am constrained to hold that this license agreement, usual and normal as I think it is in these circumstances, is legal and enforceable.

The motion for an injunction pendente lite is granted. On the settlement of the order to be entered, counsel will be heard on the amount of the bond to be furnished pursuant to Rule 65(c), Fed.Rules Civ. Proc., 28 U.S.C.A.

15. See 261 U.S. at page 476, 43 S.Ct. 450.