**UNITED STATES v. UNITED STATES ALKALI EXPORT ASS'N, Inc. et al.**

Civ. No. 24–464.

United States District Court
S. D. New York.

Aug. 12, 1949.

See also D.C., 7 F.R.D. 256.

John F. X. McGohey, United States Attorney, New York City, for plaintiff (J. Francis Hayden, Special Assistant to the Attorney General, Francis E. Dugan, Special Attorney, Antitrust Division, New York City, Burton R. Thorman, Special Attorney, Washington, D. C., Roy N. Freed, Special Attorney, Boston, Mass., and Manuel M. Gorman, Special Assistant to the Attorney General, of counsel).

Cravath Swaine & Moore, New York City, for defendant United States Alkali Export Ass'n, Inc. (William Dwight Whitney, and George S. Leonard, New York City, of counsel).

Dwight, Harris, Koegel & Caskey, New York City, for defendant Church & Dwight Co., Inc. (H. Allen Lochner, New York City, of counsel).

Sage, Gray, Todd & Sims, New York City, for defendant Hooker Electrochemical Co. (Inc.), William E. Sims, New York City, of counsel.

Chadbourne, Wallace, Parke & Whiteside, New York City, for defendant Mathieson Alkali Works (Inc.), Ralph D. Ray, and Abel I. Smith, Jr., New York City, of counsel.

Kenneth B. Ray, New York City, for defendant Westvaco Chlorine Products Corporation.

Coudert Brothers, New York City, for defendants Imperial Chemical Industries, Limited (London) and Imperial Chemical Industries, Limited (New York), Alexis Coudert, New York City, of counsel.

Oliver & Donnally, New York City, for California Alkali Export Ass'n and West End Chemical Co., Michael F. McCarthy, and Martin A. Meyer, Jr., New York City, of counsel.

S. H. KAUFMAN, District Judge.

This is an equitable proceeding brought by the United States under Section 4 of the Sherman Anti-Trust Act, 26 Stat. 209, 15 U.S.C.A. § 4, to restrain certain practices alleged to be in violation of Section 1 of the same Act, 15 U.S.C.A. § 1. The complaint was filed in March, 1944, and named as defendants two domestic export associations organized under the Export Trade Act of 1918, Webb-Pomerene Law, 40 Stat. 516, 517, Public Law 126, 65th Cong., 2nd Sess., 15 U.S.C.A. §§ 61–65, thirteen corporate. members of one or the other of said associations, and a corporation of the United Kingdom together with its New York subsidiary.

Defendants, all of which either manufacture, distribute, or export alkalis, are charged with entering into a series of agreements and engaging in concerted practices whereby the export of alkalis from the United States to many markets of the world has been restricted; the import of alkalis into the United States from abroad has been prohibited; the production of alkalis within the United States has been curtailed and limited; competition between defendants and others has been eliminated; the trade of domestic competitors of the defendants engaged in exporting alkalis has been restrained; and prices of caustic soda in the United States have been fixed.

Before the trial, all defendants moved to dismiss the complaint on the ground that under Sections 1, 2 and 5 of the Export Trade Act of 1918, 15 U.S.C.A. §§ 61, 62, 65 (hereinafter referred to as the Webb Act), the Attorney General was without authority to institute this suit until investigations and recommendations had first been made by the Federal Trade Commission. Both the District Court, United States v. United States Alkali Export Ass'n, D.C. 58 F.Supp. 785, and the Supreme Court, United States Alkali Ass'n v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554, rejected this contention and the case proceeded to trial before the late Judge Bright. Evidence was taken, testimony completed, and argument and briefs of counsel were considered, but Judge Bright's untimely

death prevented him from rendering a decision in the case. Subsequently, the entire proceeding was referred to me with the understanding that decision of the matter would be made upon the case that had been presented before Judge Bright, after reargument before me on the record as made.

## I. The Defendants.

The principal defendant, the United States Alkali Export Association (hereinafter referred to as "Alkasso"), was organized as a Delaware corporation in 1919, and, pursuant to the Webb Act, filed in that year with the Federal Trade Commission a verified written statement containing the location of its offices, names and addresses of its officers and stockholders, and a copy of its certificate of incorporation and by-laws.

Each of Alkasso's members holds stock in Alkasso, has a representative on its board of directors, and has executed a membership agreement. The purpose of the Association is to handle all sales of its members in foreign markets and, to that end, it has its own sales agents abroad, ships and sells as an independent corporation, and determines distribution of material, prices, terms, and other conditions of sale. Originally starting with five members, Alkasso's present membership numbers eleven of the most important alkali producing companies in the United States, all of which are defendants in this suit. (See chart of individual corporate defendants, infra, p. 86 F.Supp. 64.)

The California Alkali Export Association, otherwise known as "Calkex", is the second domestic export association named in the complaint. Calkex, a California corporation organized in 1936, was originally composed of three corporate members, West End Chemical Co., Inc., Pacific Alkali Co., Ltd., and American Potash & Chemical Corporation. Of these corporations, however, West End is the sole remaining member of Calkex and the only defendant in this case. American Potash withdrew from Calkex in April, 1944 at the behest of the Alien Property Custodian, who had obtained control of substantially all its capital stock; while Pacific Alkali, a defendant named in the complaint when filed, subsequently withdrew from Calkex, and the action against it was voluntarily dismissed.

Also joined as parties defendant are Imperial Chemical Industries, Ltd. (hereinafter termed "I. C. I."), a British corporation which manufactures and exports alkalis, and its wholly owned New York subsidiary, Imperial Chemical Industries (New York) Ltd. (later referred to as "I. C. I., New York").

The complaint charges as "co-conspirators", though not defendants, the American Potash & Chemical Corporation, mentioned above, Solvey Process Company, an important domestic producer of alkalis and a member of Alkasso from 1919 until 1941, Solvay et Cie—hereinafter termed "Belgian Solvay"—a corporation of the Kingdom of Belgium and a principal manufacturer of alkalis in Europe, and I. G. Farben-industrie Aktiengesellschaft, more widely known as "I. G. Farben", one of the largest chemical companies in the world at the time the acts and agreements alleged by the Government occurred.

## II. Products of Defendants.

It is important both for a general understanding of the entire case and to determine certain specific issues regarding the legality of defendants' conduct to summarize briefly the nature and characteristics of the products which were subject to the agreements and practices charged in the complaint.

What has so far been phrased in general terms as the production of "alkalis" in reality embraces the manufacture of three separate but closely related chemical substances: (1) Sodium Bicarbonate; (2) Soda Ash; and (3) Caustic Soda. Sodium Bicarbonate, well known as a household remedy for gastronomical disturbances, is also useful in cooking, and serves important industrial needs. Soda ash is a basic ingredient in the manufacture of glass, textiles, and other chemicals, while caustic soda is used in the making of soap, textiles, rayon, paper, and the refining of petroleum products.

These alkalis are produced by three common methods. The oldest and perhaps the one which yields the most satisfactory product goes under the name of the Solvay process or ammonia-soda process. Here, salt brine is mixed with ammonia and carbon dioxide to produce bicarbonate of soda. The latter is heated and in turn becomes soda ash, while soda ash, causticized with lime, reacts chemically to produce caustic soda. Thus all three alkali products are produced in the various stages of a series of consecutive chemical reactions.[1]

While the Solvay process is a deliberate and controlled method of manufacturing all three alkali products, bicarbonate of soda, soda ash, and caustic soda, the latter substance, caustic soda, also results as a by-product in the production of an increasingly important chemical, chlorine, by the electrolysis of purified brine. Formerly, caustic soda produced indirectly through the manufacture of chlorine, hereafter denominated electrolytic caustic, composed only a small proportion of the total amount of caustic made in this country, but the increased demand for chlorine in recent years has necessarily led to greater manufacture of electrolytic caustic[2]; so that by 1943, approximately 60% of total caustic produced in the United States was made by the electrolytic process.

Two of the alkalis, soda ash and bicarbonate of soda, can also be manufactured through the evaporation and purification of natural brine, the final method by which alkalis are produced.

---

[1] Chemically, the Solvay process proceeds by way of the following simplified chain of chemical reactions:

1. NaCl $+$ NH$_3$ $+$ CO$_2$ $+$ H$_2$O $\longrightarrow$ NaHCO$_3$
   (Sodium Chloride) (Ammonia) (Carbon Dioxide) (Water) (Bicarbonate of Soda)

2. NaHCO$_3$ $+$ H-E-A-T $\longrightarrow$ Na$_2$CO$_3$
   (Bicarbonate of Soda) (Soda Ash)

3. Na$_2$CO$_3$ $+$ Ca(OH)$_2$ $\longrightarrow$ NaOH
   (Soda Ash) (Lime) (Caustic Soda)

[2] The diagram below shows how the manufacture of chlorine necessarily entails the production of caustic soda:

NaCl $+$ H$_2$O $+$ electric current $\longrightarrow$ Cl $+$ H $+$ NaOH
(Chlorine) (Hydrogen) (Caustic Soda)

The chart [3] below lists the domestic corporate defendants, the products they manufacture, and the method employed in production.

### III. The International Cartel.

No issue of fact is presented with regard to the agreements, as later set forth, which the Government maintains are violations of its anti-trust laws. The answers of Alkasso and of I. C. I. admit the execution of agreements relating to the division of world markets, the assignment of international quotas, and the fixing of prices in territories other than the United States, and the individual corporate members of Alkasso admitted knowledge of these cartel arrangements. Solely for determination, therefore, is their legality under the provisions of the Sherman Act and whether or not, if illegal under the Sherman Act, they are exempted from condemnation by virtue of the provisions of the Webb Act.

Insofar as the application of the Webb Act is concerned, the case is *res nova,* since the Webb Act has not heretofore been construed by the courts.

The conspiracy charged initiated as early as 1924 and is evidenced by an agreement between Alkasso and Brunner Mond & Co., Ltd., the corporate predecessor of I. C. I. Under this international contract, the British company agreed to refrain from exporting soda ash and caustic to Cuba; maximum quotas were established for Brunner Mond and Alkasso in Mexico, the British having rights to supply forty per cent.

[3] Chart Showing Individual Domestic Corporate Defendants; Products They Manufacture; Method of Manufacture

| Defendant | Product | Method Employed | |
|---|---|---|---|
| | | Solvay | Electrolytic |
| Pittsburgh Plate Glass (succeeded by consolidation to Alkasso in 1920) | soda ash, bicarbonate of soda, caustic soda | x | x |
| Diamond Alkali (Alkasso–1919) | soda ash, bicarbonate of soda, caustic soda | x | x |
| The Mathieson Alkali Works (Alkasso–1919) | soda ash, bicarbonate of soda, caustic soda | x | x |
| Wyandotte Chemicals Corp. (succeeded by merger to Alkasso in 1943) | soda ash, bicarbonate of soda, caustic soda | x | x |
| Southern Alkali Corp. (Alkasso–1935) | soda ash and caustic soda only | x | x |
| Church & Dwight (Alkasso–1930) | Bicarbonate of soda only | x | |
| Hooker Electrochemical (Alkasso–1919) | caustic soda only | termed the "electrolytic group" because engaged solely in the manufacture of caustic soda by the electrolytic process | |
| Dow Chemical Co. (Alkasso–1934) | caustic soda only | | |
| Niagara Alkali Co. (Alkasso–1934) | caustic soda only | | |
| Pennsylvania Salt Manufacturing Co. (Alkasso–1919) | caustic soda only | | |
| Westvaco Chlorine Products Corp. (Alkasso–1922) | caustic soda only | | |
| West End Chemical Co. (Calkex–1936) | soda ash and bicarbonate of soda only | Manufactures its products from natural brine obtained in California. | |

and Alkasso sixty per cent. of the total tonnage; annual maximum tonnages of alkalis to be exported to South America were established; prices were to be raised in the South American market, and both parties agreed to sell at uniform prices thereafter.

The understanding of 1924 was enlarged in 1929 when I. C. I. and Alkasso entered into a three year agreement. Under the new arrangement, Alkasso was given an annually increasing share in the total combined export trade in alkalis from the United Kingdom and the United States. It was agreed that in 1930 Alkasso was to participate to the extent of twenty-two and one-half per cent. of joint total exports, while this percentage was to increase to twenty-five per cent. by 1932.

Upon its expiration, the 1929 agreement was renewed by the parties in 1933 with slight modifications and additions. Alkasso again was given a one-quarter share in total exports of alkalis from the United Kingdom and the United States. It was agreed that Alkasso and I. C. I. would sell at agreed prices in markets not specifically enumerated; and percentage shares of the export market were allotted in the markets of Mexico, China, and India. This new undertaking was to last for three years.

Finch, President of Alkasso since 1929, testified at the trial that an oral understanding was also reached between I. C. I. and Alkasso in 1933 whereby the latter agreed to forego all shipments of alkali to the continent of Europe and to the British Empire including Australia and New Zealand.

In 1936, Belgian Solvay became a formal party to the cartel arrangement of I. C. I. and Alkasso, although the Government introduced evidence to show that Belgian Solvay and I. C. I. had bargained with respect to export markets as early as 1928 (Gov. ex. 1). Under the tripartite arrangement, by its terms to run until 1941, exclusive territories were granted to each of the participants. Solvay was to hold sway with regard to alkali sales in Europe, and I. C. I. was granted sole rights to the

sale of alkali throughout the British Empire (excluding Canada), Egypt, the Levant, Iraq and Iran; Alkasso was granted the territories of Canada, Mexico, Cuba, Haiti, San Domingo, and the Dutch East Indies; and I. C. I. and Alkasso agreed that certain other markets should be considered as joint territories, principally China, Japan, River Plate, Brazil, along with other markets in South America, and percentage quotas for these areas were established.

In 1941, apparently the war made it impossible for Belgian Solvay to continue to participate in international shipments of alkalis. Alkasso and I. C. I., however, again entered into economic negotiations. The result was an agreement which, while recognizing that the war had made it impracticable any longer to subject certain markets to cartel arrangements, made detailed quota arrangements in important joint markets. The language of the agreement stated specifically that there would be "no change affecting exclusive markets".

Evidence was also introduced at the trial showing that during the period covered by the cartel agreements outlined above, certain collateral arrangements regarding the shipment and sale of alkalis existed between I. C. I., Belgian Solvay, and I. G. Farben dividing world markets (Def. ex. G), and alloting Scandinavia as exclusive territory to I. G. Farben (Gov. ex. 28, 36, 42).

Defendants make no attempt to conceal the substance of their arrangements to allocate the world markets in alkalis. Indeed, the broad outlines of the successive agreements were openly communicated to the Federal Trade Commission (Def. ex. B, C, S). Defendants rest their claim of justification entirely upon the provisions of the Webb Act, claiming that, by virtue of that statute, the anti-trust laws have no applicability to world wide apportionment of territory, establishment of exclusive markets, and the fixing and maintenance of prices between foreign competitors and export associations organized in the United States under the terms of the Act.

Section 2 of the Webb Act, 40 Stat. 517, 15 U.S.C.A. § 62,[4] provides that the Sherman Anti-Trust Act shall not, except in certain enumerated instances, apply to the formation of an export association engaged solely in the export trade or to "an agreement made or act done in the course of export trade by such association * * *". The question for determination, therefore, is whether or not this language authorizes export associations organized under the Webb Act to enter into such arrangements as those above set forth.

The decisions under the Sherman Act leave no doubt that all contracts, combinations, and conspiracies aimed at obstructing the foreign commerce of the United States come within the broad prohibitions of the anti-trust laws. United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; United States v. Pacific & Arctic Co., 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742; Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597, Ann.Cas.1917D, 322; United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592 71 L.Ed. 1042; United States v. Aluminum Co. of America., 2 Cir., 148 F. 2d 416; United States v. National Lead Co., D.C. 63 F.Supp. 513, affirmed 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077. The rule of competition, basic in American economic philosophy and approved by express legislative fiat in the Sherman Anti-Trust Act, is equally applicable to our export trade as it is to trade among the several states. United States v. Aluminum Co. of America, D.C., supra, 148 F.2d at page 444. The contention by the defendants during the trial was that the purpose of the Webb Act was to repeal entirely the provisions of the Sherman Act as they applied to international trade and to leave our foreign commerce completely unfettered by any statutory restraints.

Unquestionably the cartelization of the world, if accomplished by the individual corporate defendants separately and not through an association organized under the Webb Act, would be a flagrant transgression of the anti-trust laws. As to this, there could be no doubt since the decision of Judge Rifkind in the National Lead case, D.C., 63 F.Supp. 513, where it was declared: "No citation of authority is any longer necessary to support the proposition that a combination of competitors, which by agreement divides the world into exclusive trade areas, and suppresses all competition among the members of the combination, offends the Sherman Act." 63 F.Supp. at page 523.

Therefore, apart from the question presented here as to the immunity afforded to export associations organized under the Webb Act, the National Lead case, together with the case of United States v. General Dyestuff Corp., D.C., 57 F.Supp. 642, also decided by Judge Rifkind, indicates clearly that the type of economic conduct pursued by defendants is prohibited by the Sherman Act. See also United States v. General Electric Co., D.C., 80 F.Supp. 989, 1009; United States v. Timken Roller Bearing Co., D.C., 83 F.Supp. 284, 307–309; United States v. General Electric Co., D.C., 82 F.Supp. 753, 847. Consequently, to hold in this case that defendants, by employing the medium of an export association, may restrain our foreign trade with impunity, uninhibited by the sanctions and proscriptions of the Sherman Act, would be to ig-

---

[4] "Sec. 2. That nothing contained in the Act entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies,' approved July second, eighteen hundred and ninety, shall be construed as declaring to be illegal an association entered into for the sole purpose of engaging in export trade and actually engaged solely in such export trade, or an agreement made or act done in the course of export trade by such association, provided such association, agreement, or act is not in restraint of trade within the United States, and is not in restraint of the export trade of any domestic competitor of such association: *And provided further*, That such association does not, either in the United States or elsewhere, enter into any agreement, understanding, or conspiracy, or do any act which artificially or intentionally enhances or depresses prices within the United States of commodities of the class exported by such association, or which substantially lessens competition within the United States or otherwise restrains trade therein."

nore the plain intent of the statute. To remove cartel agreements, if made by export associations organized under the Act, from the comprehensive ban of the Sherman Act, while at the same time condemning similar agreements by others, would be to overlook the fact that it was the evil of restraint on commerce which Congress sought to extirpate, and not the creation of a preferred class which was to be free to continue the evil. Cf. United States v. Sisal Sales Corp., supra; United States v. American Tobacco Co., supra; United States v. General Dyestuff Corp., supra.

Whatever exemptions the Webb Act did bestow upon associations organized thereunder, it affirmatively appears upon the face of the statute that Congress did not intend thereby to abandon the rule of competition as applied to our export trade. All privileges accorded under the Act are removed should any association, agreement or act be "in restraint of the export trade of any domestic competitor of such association." This strong solicitude for those in this country who would be forced to compete with such associations abroad would be entirely frustrated if such cartel patterns as were established here were permitted under the Act. For as long as one rival of an export association sought to vend his wares in foreign territory, international agreements of the kind here involved could do naught but restrain his trade. As the Supreme Court has succinctly indicated, International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20, "it is unreasonable, *per se,* to foreclose competitors from any substantial market." See, also United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236. Nor can the stifling effect of such arrangements upon potential competition be overlooked. Cf. United States v. Griffith, supra, 334 U.S. at page 107, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Timken Roller Bearing Co., D.C., supra, 83 F.Supp. at page 318.

Far from restricting the application of the anti-trust laws abroad, the Webb Act made what, at the time of its passage, were wide extensions in the extraterritorial effect of those laws designed to preserve competition.[5] Section 5 of the Act enlarged the investigatory powers of the Federal Trade Commission to situations where " * * * an association either in the United States or *elsewhere* has entered into any agreement, understanding, or conspiracy, or done any act which artificially or intentionally enhances or depresses prices within the United States of commodities of the class exported by such association, or which substantially lessens competition within the United States or otherwise restrains trade therein * * *." (Emphasis supplied.)

Section 4 of the Act was of even broader scope. It granted world-wide operation to Section 5 of the Federal Trade Commission Act, Pub.Law 203, 63rd Cong., 2nd Sess., 38 Stat. 719, 15 U.S.C.A. § 45, in the following language: "That the prohibition against 'unfair methods of competition' and the remedies provided for enforcing said prohibition contained in the Act entitled 'An Act to create a Federal Trade Commission, to define its powers and duties, and for other purposes,' approved September twenty-sixth, nineteen hundred and fourteen, shall be construed as extending to unfair methods of competition used in export trade against competitors engaged in export trade, even though the acts constituting such unfair methods are done without the territorial jurisdiction of the United States."

The effect of Section 4 of the Webb Act was to condemn such "unfair methods of competition", wherever committed. Nor does this section draw any distinction between associations organized under previous sections of the Webb Act and other corporations engaging in export trade, and consequently must be held to apply equally to export associations as to others.[6]

---

[5] The oft distinguished Banana Case had at that time left in doubt the extent to which the Sherman Act applied to extraterritorial restraints of trade. American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047.

[6] See Notz, The Webb-Pomerene Law— Extraterritorial Scope of the Unfair Competition Clause (1919), 29 Yale L. J.

■ The Federal Trade Commission Act was specifically designed to remedy the economic abuses which had been revealed by actions instituted under the Sherman Act, Federal Trade Commission v. Keppel & Bro., 291 U.S. 304, 310, 54 S.Ct. 62, 78 L.Ed. 536. And included within the generic term "unfair methods of competition" are exactly those practices which the Sherman Act declares illegal [7], including price maintenance [8], establishment of quotas [9], and the suppression of competition [10]. Therefore, the Webb Act, by declaring such conduct, if engaged in by American enterprise abroad, would be illegal, became a remedial statute. It was designed to make the rule of competition equally as applicable to our commerce between nations as it was to trade among the several States. Branch v. Federal Trade Commission, 7 Cir., 141 F.2d 31, 36.

A reading of the Webb Act in its entirety must therefore lead to the rejection of the claim that the cartel agreements involved herein are sanctioned under the Act. It cannot be concluded that Congress exempted such agreements and practices from the scope of the Sherman Act by Section 2 of the Webb Act, and at the same time outlawed the consequences of such economic conduct by Section 4 of the Webb Act. The only alternative would be to argue that the purpose of the Act was to vest exclusive control and jurisdiction of extra-territorial restraints of trade with the Federal Trade Commission. That hypothesis, however, is no longer open. United States Alkali Association v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554.

The legislative history of the Webb Act, when considered as a whole, refutes any claim that the Act was intended to leave the foreign commerce of the United States free of, and unfettered by, the anti-trust laws. The isolated statements, removed by defendants from context and cited for that contention, do not reflect the true purport of the Act and are unreliable guides for judicial interpretation in the face of the entire Congressional history of the statute indicating an abiding contrary intent. See Federal Trade Commission v. Cement Institute, 333 U.S. 683, 692, 68 S.Ct. 793, 92 L.Ed. 1010.

The Webb-Pomerene Act was not haphazard legislation passed without the considered judgment of Congress [11] and the executive branch.[11a] Behind its passage was

---

29, 31; Federal Trade Commission, Foreign Trade Series No. 2 (1935), p. 2; Hearings before House Committee on the Judiciary, 64th Cong., 1st Sess. (1916), Serial No. 46, p. 70.

[7] Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1009; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 463, 61 S.Ct. 703, 85 L.Ed. 949; Eugene Dietzgen Co. v. Federal Trade Commission, 7 Cir., 142 F.2d 321, 326–327, certiorari denied 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 586; Beer, Federal Trade Law and Practice (1942), p. 94.

[8] Federal Trade Commission v. Cement Institute, 333 U.S. 683, 61 S.Ct. 703, 85 L.Ed. 949; Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 225, 71 L.Ed. 534; Eugene Dietzgen Co. v. Federal Trade Commission, 7 Cir., 142 F.2d 321, certiorari denied 323 U.S. 730, 65 S.Ct. 66, 89 L. Ed. 586.

[9] California Lumbermen's Council v. Federal Trade Commission, 9 Cir., 115 F. 2d 178, certiorari denied 312 U.S. 709, 61 S.Ct. 827, 85 L.Ed. 1141.

[10] Federal Trade Commission v. Beech Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; United States Maltsters Ass'n v. Federal Trade Commission, 7 Cir., 152 F.2d 161.

[11] See H.R. 16707, 64th Cong., 1st Sess., 1916; H.R. 17350, 64th Cong., 2nd Sess., 1916; H.R. 2316, 65th Cong., 1st Sess., 1917; Senate 634, 65th Cong., 1st Sess., 1917; Hearings before House Committee on the Judiciary on H.R. 16707, 1916; Hearings before Senate Committee on Interstate Commerce on H.R. 17350, 1917; H. Rpt. No. 1118, 64th Cong., 1st Sess., 1916; S. Rpt. No. 1056, 64th Cong., 2nd Sess., 1917; H. Rpt. No. 50, 65th Cong., 1st Sess., 1917; Sen. Rpt. No. 109, 65th Cong., 1st Sess., 1917; S. Rpt. No. 9, 65th Cong., 1st Sess., 1917; H. Rpt. No. 468, 65th Cong., 2d Sess., 1918.

[11a] See H. Rpt. No. 50, to accompany H.R. 2316, 65th Cong., 1st Sess., 1917, p. 2; Temporary National Economic Committee, Monograph No. 6, Export Prices and Export Cartels, 76th Cong., 3d Sess., 1940, p. 118.

a thorough investigation by the Federal Trade Commission, which, in 1916, published a two volume report entitled "Cooperation in American Export Trade", calling for the enactment of remedial legislation to enable American enterprise to garner its share of foreign trade.

The report of the Federal Trade Commission is especially significant because it was presented to Congress and represented the background of the drafting, debating, and passage of the Act. It called to the attention of Congress the large economic units of other countries against which American exporters and manufacturers had to compete, and recommended that those in this country engaged in foreign trade be permitted to cooperate in order to meet the competition of large foreign combines. But the entire emphasis of the Federal Trade Commission's recommendations was upon furthering competition between domestic and foreign concerns and not the elimination thereof.[12] Nor did the Commission leave any impression that it intended to free the international commerce of Americans from all requirements of the trust laws. It fully recognized that "The dangers in cooperative action must be faced frankly and provided against fully" [13], but strongly believed that its goal could be achieved "without altering the policy of the antitrust laws or interfering with their enforcement".[14]

The committee reports submitted to the Congress prior to the passage of the Webb Act indicate that doubt as to the applicability of the Sherman Act to combinations of American manufacturers selling abroad necessitated declaratory legislation permitting the association of domestic concerns for the purpose of competing with foreign nations in extraterritorial markets.[15] The reports specifically pointed out that "The

[12] Federal Trade Commission, Report on Cooperation in American Export Trade (2 vols., 1916), Vol. I, p. 8. The Commission's summary of its recommendations (Vol. I, pp. 379–381) indicated its belief "that American exporters should be enabled to compete in foreign markets on more nearly equal terms with foreign competitors * * *. It does not believe that Congress intended by the antitrust laws to prevent Americans from cooperating in export trade for the purpose of competing effectively with foreigners * * *." The above is reprinted in Temporary National Economic Committee, Monograph No. 6, Export Prices and Export Cartels, 76th Cong., 3rd Sess., 1940, p. 117. The Commission directly informed Congress that legislation permitting combinations of Americans at home would enable our industry to "compete more successfully with foreign syndicates and cartels." 55 Cong. Rec. 3577.

[13] Summary of "Cooperation in American Export Trade" made to Congress by the Federal Trade Commission, 55 Cong. Rec. 3576–3577. The Commission indicated that whatever legislation was passed should be crystal clear in preventing export associations from gaining a competitive advantage over domestic rivals "through the use of methods which would be considered unfair practices in the United States * * *". Federal Trade Commission, Report on Cooperation in American Export Trade (1916), Vol. I, p. 378.

[14] Id.

[15] H. Rpt. No. 1118 to accompany H.R. 17350, 64th Cong., 1st Sess., 1916, reprinted in H. Rpt. No. 50 to accompany H.R. 2316, 65th Cong., 1st Sess., 1917, pp. 2–4, declared, "Our exporters are forced to meet sharp competition in the foreign trade * * *. One prime result of the common selling agency would be to reduce the cost of marketing the product and to that extent help the exporter's profits and enable him the more easily to meet foreign competition. * *

"In order that this country may hold the foreign trade which has been acquired during the European war and successfully meet the competition that will be offered when the war is over our exporters must be in a position to compete in the cheapest and most effectual manner." (p. 2)

S. Rpt. No. 1056, to accompany H.R. 17350, 64th Cong., 2nd Sess., 1917, reprinted in S. Rpt. No. 9 to accompany Senate 634, 65th Cong., 1st Sess., 1917, pp. 2–4, again emphasized the aspect of competition. "The committee believes that as amended this bill will give to those interested in our foreign trade the full power to organize with respect to that trade so as to enable them to meet our foreign competitors * * *." (p. 4) The committee indicated, however, that "While the purpose of the bill is to

bill does not authorize any violation of the present antitrust laws." [16]

The constant reassurance by sponsors of the legislation to the Congress that the bill did not remove the sanctions of the antitrust laws as applied to our foreign trade is cogent and compelling reason for concluding that the framers of the Webb Act had no intention of permitting international combinations to trade unbridled in the markets of the world. The advocates of the Act constantly maintained that its passage was necessary to enable smaller producers and manufacturers in this country to form cooperative selling agencies in order to compete effectively with large foreign units abroad.[17] Suggestion that by so doing, all restraints upon our foreign commerce were thereby repealed was sharply rejected.[18]

Viewing the Webb Act in the light of contemporaneous interpretation of the antitrust laws, considering the import of the Act when read as a whole, and giving careful attention to the entire legislative history of its passage, the conclusion is irresistible that the Webb-Pomerene Act affords no right to export associations to engage on a world-wide scale in practices so antithetical to the American philosophy of free competition. The international agreements between defendants allocating exclusive markets, assigning quotas in sundry markets, fixing prices on an international scale, and selling through joint agents are not those "agreements in the course of export trade" which the Webb Act places beyond the reach of the Sherman Law. Cf. United States v. Borden, 308 U.S. 188, 60 S.Ct. 182, 84 L.

---

increase our foreign trade, it should not result in destroying the business of other companies, associations, or individuals who may be engaged in the foreign trade. The purpose is to increase and improve this trade, not to injure it." (p. 3)

[16] House Report 1118 to accompany H. R. 17350, 64th Cong., 1st Sess., 1916, reprinted in H. Rpt. No. 50, to accompany H.R. 2316, 65th Cong., 1st Sess., 1917, p. 3.

[17] See Statements of Mr. Webb, 53 Cong. Rec. 13538, 13539, 55 Cong. Rec. 3564; Mr. Gard, 55 Cong. Rec. 3568; Senator Pomerene, 56 Cong. Rec. 71, 181, 182; Senator Kellogg, 56 Cong. Rec. 110–111.

[18] See statements of Mr. Webb, 53 Cong. Rec. 13536, 13540, 13705, 55 Cong. Rec. 3577; Mr. Caraway, 55 Cong. Rec. 3574; Senator Pomerene, 55 Cong. Rec. 2786, 7326; 56 Cong. Rec. 119. Senator Pomerene openly stated to the Senate considering the Act: "* * * although an association organized under the pending bill should enter into some agreement or perform some act in a foreign country which met the requirements of law there, if at the same time the effect of it were such as to materially interfere with the policy of the United States under its trust laws, then it would be subject to the jurisdiction of the authorities of this country, including both the Federal Trade Commission and the Department of Justice." (56 Cong. Rec. 170)

In refuting the contention that the

Webb Act would permit associations formed under the Act to participate in world-wide cartels, Senator Pomerene declared:

"* * * if I may refer to another phase of this debate, a very plausible argument was made on yesterday when the position was taken in substance that this bill was a repeal of the Sherman antitrust law, and if it became the law of the land and these associations were authorized they would at once seek to control the foreign market, and probably enter into a combination with foreign companies and cartels engaged in the same line of business * * *."

"If the Senator when making this argument had recited facts instead of fancies, there might have been some force in his utterances, but he was giving free rein to his imagination. The Senator overlooked the fact that this bill does not repeal the Sherman law." (56 Cong. Rec. 172)

Further statements by Senator Pomerene were to the same effect. He declared, in speaking of the Webb Act, "It does not repeal, it does not affect the Sherman law so far as it applies to domestic commerce. It strengthens the Sherman law and the Federal Trade Commission law, in so far as unfair practices are concerned beyond territorial lines." (56 Cong.Rec. 173); he specifically pointed out that "There is nothing in this bill authorizing the division of territory abroad." (56 Cong.Rec. 181)

Ed. 181; American Cooperative Serum Ass'n v. Anchor Serum Co., 7 Cir., 153 F.2d 907, 912, certiorari denied 329 U.S. 721, 67 S.Ct. 57, 91 L.Ed. 625.

In reaching this conclusion, the ruling of the Federal Trade Commission in the Silver Letter [19], suggesting the possible legality of international agreements touching only foreign markets and the continued adherence by the Commission to a modified version of that position has not been overlooked.[19(a)] But, as has already been indicated, United States Alkali Ass'n v. United States, 325 U.S. 196, 208, 65 S.Ct. 1120, 89 L.Ed. 1554, the Commission is not entrusted with enforcing the Sherman Act. Nor is it the Commission which ultimately determines what economic behavior constitutes "unfair methods of competition" within the purview of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq. Federal Trade Commission v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 64 L.Ed. 993; Federal Trade Commission v. Beech Nut Packing Co., 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Federal Trade Commission v. Curtis Publishing Co., 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408; Ford Motor Co. v. Federal Trade Commission, 6 Cir., 120 F.2d 175, 181, certiorari denied 314 U.S. 668, 62 S.Ct. 130, 86 L.Ed. 535; Federal Trade Commission v. Balme, 2 Cir., 23 F.2d 615, 619. In any case, administrative interpretation must fall where clearly unsanctioned by law or in conflict with judicial decision. Jewell Ridge Coal Corp. v. Local No. 6167, 325 U.S. 161, 169, 65 S.Ct. 1063, 89 L.Ed. 1534; Neuberger v. Commissioner, 311 U.S. 83, 88-89, 61 S.Ct. 97, 85 L.Ed. 58; Estate of Sanford v. Commissioner, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20; United States v. Phelps Dodge Mercantile Co., 9 Cir., 157 F.2d 453, 456, certiorari denied 330 U.S. 818, 67 S.Ct. 675, 91 L.Ed. 1270.

## IV. The United States as Territory Embraced by the Cartel.

Notwithstanding the foregoing interpretation of the Webb Act relating to the division of foreign markets, price fixing, and elimination of competition abroad, it is deemed advisable to dispose of the questions of fact presented at the trial. The first of these is whether or not the United States was territory reserved to Alkasso under international compact.

The contracts introduced in evidence between Belgian Solvay and I.C.I. in 1928 and 1935 (Gov. ex. 1 and Def. ex. F) and the contract of Belgian Solvay, I.C.I., and I. G. Farben of 1938 (Def. ex. G) are ambiguous and do not, standing by themselves, lead to an inference that the United States was specifically a market prohibited to any of the contracting parties.[20] Nevertheless the preponderance of the evidence does indicate that at least as early as 1933, the United States became territory subject to international partition among the defendants.

---

[19] The letter was written in response to an inquiry regarding certain hypothetical issues raised by the silver producers and was published in a news release of August 6, 1924. See Temporary National Economic Committee, Monograph No. 6, Export Prices and Export Cartels, 76th Cong., 3d Sess., 1940, p. 125.

[19a] In the Matter of Florida Hard Rock Phosphate Export Ass'n., Docket 202-2, 40 F.T.C.D. 843; In the Matter of Phosphate Export Ass'n., Docket 202-3, 42 F.T.C.D. 555. The Commission, in these proceedings, has inquired into the reasonableness of cartel agreements as they affect our foreign trade rather than condemn them as illegal per se. Cf., however, the following economic reports published by the Federal Trade Commission: Report on the Copper Industry, Part I, The Copper Industry of the United States and International Copper Cartels (1947), pp. 225-226; Report on the Sulphur Industry and International Cartels (1947), pp. 13-16, 82-84, 104-105; Report on International Steel Cartels (1948), pp. 5, 12-13, 40-41, 65, 115; Report on International Electrical Equipment Cartels (1948), pp. 8-9.

[20] The intent of the agreement of 1928 to bar shipments to the United States is not clear. In any case, the 1935 agreement superseded all prior arrangements and indicated that the United States was "Territory common to both Parties" and that I.C.I. and Belgian Solvay would each have the right "to manufacture and to sell in the United States * * *." The division of 1938 shows joint participation in the American market.

In the spring of 1933, a draft of the 1933 agreement later entered into by I.C.I. and Alkasso was submitted to Finch, Alkasso's president, by Wallace on behalf of I.C.I. (Gov. ex. 214). Included in the draft were the following terms:

"To Great Britain, the Continent of Europe, Australia and New Zealand, Alkasso will not ship in excess of their 1932 shipments to each or any of these markets.

"I.C.I. will correspondingly not increase their shipments to U.S.A. and its dependencies Cuba, Hawaii, etc." (Gov. ex. 216.)

Finch returned the draft to Wallace, then in London, with the two clauses quoted above deleted. Attached to his accompanying letter was a slip saying: "Discussed this matter with George White who will be writing you." (Gov. ex. 216) White, who headed I.C.I.'s subsidiary in New York, sent a letter to Wallace on July 13, stating that the omissions requested by Finch were made "in order to avoid embarrassing questions which might be raised by the Federal Trade Commission should they call for a copy of the agreement * * *". The letter indicated further, however, that the deletions "will not alter the agreement or change the undertaking mutually reached in New York * * *." (Gov. ex. 215)

Finch admitted that he had deleted the two provisions from the draft of the 1933 agreement and that he had discussed the draft with White. He further testified that he subsequently agreed that Alkasso would thereafter refrain from exporting to the continent of Europe, Great Britain, and the British Empire, including New Zealand and Australia. He denied categorically, however, that any undertaking had been made to restrain British imports into the United States or that he had told White the deleted provisions of the agreement had been stricken to avoid complications with the Federal Trade Commission. Other members of the Association's board of directors testified that they were unaware of any agreement on the part of I. C.I. to remain without the market place of this country. But Finch's recollection of the events of 1933 was not at all clear [21], while defendants' own evidence shows that Alkasso's directors would not necessarily be formally informed of such a provision in a cartel agreement (Def. Ex. A).

Further evidence that the market of the United States fell within the world division of territory is contained in the Minutes of the General Purposes Committee of I.C.I. in 1936 where Nicholson, a senior director of I.C.I., in summarizing the cartel agreement of 1936 between I.C.I., Alkasso, and Belgian Solvay, indicated that the United States was included within the exclusive territory allotted to Alkasso (Gov. ex. 221). It is conceded by I.C.I. that the minutes correctly record Nicholson's summary of the agreement (Gov. ex. 226) and it further appears that, based upon this summary, I.C.I.'s directors approved the arrangement which placed this country among the private markets of Alkasso (Gov. ex. 222). Thereafter, I.C.I., in its reports to Alkasso relating to international shipments grouped the United States among those countries included within Alkasso's exclusive sphere (Gov. ex. 194, 195, 196).

Finch testified that the provision granting the United States to Alkasso as an exclusive market was reinserted by I.C.I. in its draft of the 1936 agreement merely as a sop to prevent shipments by Alkasso to the continent and that he had again insisted upon its deletion.

Further testimony adduced on the part of defendants was that the paucity of imports into this country during the period under consideration was due to the economic unfeasibility of shipping alkalis to this country from abroad because of tariff barriers, extra freight charges, and a domestic preference for liquid caustic which could not be shipped across the ocean in that state.

---

[21] At first Finch disclaimed all knowledge as to any agreement on the part of Alkasso to cease shipping to Europe in 1933. He later admitted such arrangement after his memory had been refreshed by the Government's documentary evidence.

In weighing the conflicting evidence, the contemporaneous documents showing that the United States was, at the time the agreements were executed, intended to be part of the exclusive territory of Alkasso must be given greater weight than the defendants' present denials. United States v. U. S. Gypsum Co., 333 U.S. 364, 395-396, 68 S.Ct. 525, 92 L.Ed 746; United States v. Corn Products Refining Co., 2 Cir., 234 F. 964, 978; United States v. General Electric Co., D.C. 82 F.Supp. 753, 844-845; see United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541, 553. The silent fact that the final written agreement made no reference to the allocation of the United States, while almost every other country in the world was divided and apportioned by these parties to the cartel, coupled with the fact that the markets of the United States were shown to be a subject of substantial international interest (Gov. ex. 20, 21, 194, 195, 196), leads to the conclusion that the omission was born of the fear that an express allocation of the United States would make the agreement illegal on its face. This is made stronger by the fact that the domestic market of each of the other cartel members was considered vested in the home producer (See Exhibit D to the complaint), and that, under the agreements, which made each member of the cartel responsible under quota arrangements for all material exported from its exclusive territory, Alkasso assumed liability for all shipments of alkalis from the United States. (See Exhibits A, B, C, D to the complaint) Statistics introduced in evidence by both sides are one in showing how negligible were imports of all alkali products into this country during the entire period of the conspiracy. (Gov. ex. 198, 199, Def. ex. P, Q) All of the above facts must be considered in the light of evidence indicating that as early as 1929 Alkasso and I.C.I. had entered into such close alliance that it was "understood there will be complete co-operation between us in order to avoid competition in any part of the world * * *." (Exhibit B to the complaint.)

Nor is it entirely evident that defendants were without economic motive for including the United States within the provisions of the international compact. Many of the factors relied upon to prove the unfeasibility of imports here would apply equally as well to the markets of Canada and Mexico, countries prominently mentioned in the division of international trade. These two markets were always within the export orbit of Alkasso despite recognition in the agreements of the principle of Imperial preference (Gov. ex. 174, 175), which would logically have made Canada a market of I.C.I.

Defendants' own economic expert admitted that the same economic deterrents against exporting alkalis from Europe to the United States existed with respect to exporting from this country to Great Britain, and that there was no more likelihood of an agreement by Alkasso not to invade the market of the United Kingdom than there was for a covenant by I.C.I. to refrain from exporting to the United States. Yet Finch admitted the existence of an express obligation by Alkasso to respect the sanctity of the British home market and such was the tenor of the agreement of 1936 (Exhibit D to the complaint).

The factors suggested to keep imports of alkali out of the United States in no way made it economically unfeasible for Alkasso to ship to Europe had it so wished (Gov. ex. 10, 11, 12, 14, 19). While the American tariff would no doubt prove discouraging, the period of greatest imports of caustic and soda ash into this country occurred at a time when the tariff rate was at its highest (Def. ex. P, Q), and Alkasso itself had at one time expressed a willingness to enter into foreign markets where there existed high preferential tariff rates (Gov. ex. 20). Even assuming it unprofitable for foreign producers to export to the United States, it is not difficult to see the advantage to Alkasso of a covenant protecting the domestic market when it is considered what a sustained policy of foreign dumping would have done to the stable price of alkalis

which existed in this country during the period in question, or how such a policy would have interfered with the methods Alkasso employed to prevent caustic from reaching the hands of competing American exporters.

■ What has already been said about the Webb Act renders unnecessary lengthy discussion of the legality of an agreement between an export association organized under the Act and a foreign seller prohibiting imports into the United States. It should be pointed out, however, that the provisos of Section 2 of the Webb Act withdraw all immunities afforded by the Act from associations that enter into any agreement, understanding, or conspiracy "which substantially lessens competition within the United States or otherwise restrains trade therein", or which is "in restraint of trade within the United States". There can be no question that imposing upon the domestic market restraints which ban all imports of a given commodity into this country is conduct expressly made subject to the anti-trust laws by these provisos of the Webb Act. The original contention by defendants, later abandoned, that such a provision was not an unreasonable restraint of trade within the meaning of the Sherman Act is without merit. United States v. General Dyestuff Corp., D.C., 57 F.Supp. 642, 649; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 444; United States v. National Lead Co., D.C., 63 F.Supp. 513, 527.

### V. Participation of Calkex in the International Cartel.

■ Calkex asserts as a defense that it was never party to the international cartel. The contention, however, is without substance for, as will appear below, the very formation of Calkex sprang from the overall international agreements. Once in existence, Calkex agreed to market its material through agents of Alkasso and to limit its exports to specifically designated territories (Exhibit E to the complaint). Although Calkex never signed the international agreements, its entire conduct was directed toward conforming to and abetting the pattern set by the international cartel. Thus Calkex withdrew from Europe, where prior to its formation its members had sold considerable quantities of soda ash (Gov. ex. 148, 149, 156, 157, 159). Calkex, along with its members, respected the cartel arrangements in business negotiations (Gov. ex. 150, 152, 153, 160, 161, 162), entered into direct discussions with I.C.I. regarding certain markets, and sold ash through I.C.I. agents in China and India. In its own eyes, Calkex considered itself a full and intimate member of the international alliance (Gov. ex. 150, 151, 154). Under these circumstances, there is no basis for its exoneration.

### VI. Elimination of Export Competitors.

Having by international agreement abolished competition in foreign trade and obtained its share of international markets, Alkasso proceeded upon what overwhelming evidence shows to be a deliberate attempt to eliminate all domestic competition in the exporting of alkalis. The practices engaged in to this end were pursued as a direct consequence of the international cartels[22] and forcefully indicate why such international restraints of trade are interdicted by the Sherman Act and in no way sanctioned by the Webb Act.

It was incumbent upon Alkasso, starting from the earliest international agreement, to assume total responsibility under its export quotas for all alkalis exported from the United States.[23] Exports from this country to exclusive territories of other nations would consequently be deductible from Alkasso's tonnage in joint markets. More important, however, such exports might endanger the entire fabric of the in-

---

[22] See Gov. Exhibits 17, 34, 70, 71, 81, 84, 87. In its earliest cartel agreement with I.C.I., Alkasso expressly obligated itself to "take the necessary steps to control Inyo and any other makers of alkali products in the U.S.A." Such

covenant is implicit in the subsequent agreements.

[23] Exhibit A to the complaint; Exhibit B to the complaint; see Exhibit C to the complaint, par. 11, and Exhibit D to the complaint, pars. 3, 6.

ternational cartel structure.[24] On the other hand, exports from the United States by non-members of the cartel to Alkasso's exclusive or joint markets would sharply curtail the price advantage achieved through monopoly control.[25] In order, therefore, to keep its own markets free from price competition, to keep international agreements intact, and to secure maximum export tonnage thereunder for itself, Alkasso set upon a course to stifle all exports of alkalis from the United States other than shipments effected through or under its direction.

To prevent exports through independent sources, all agreements with members from 1924 until 1940 contained provisions appointing Alkasso exclusive agent for the sale of members' material abroad and permitting independent shipments only upon Alkasso's express permission in writing. This exclusivity clause was stricken from membership agreements in 1940 after the Federal Trade Commission had suggested its illegality in the case of the Pacific Forest Industries.[26] As a matter of practice, however, members thereafter consistently adhered to the policy of refusing requests for export tonnage and considered Alkasso their sole agent for foreign sales (Gov. ex. 63, 64, 65, 66, 67, 68, 69); while Alkasso continued to "contact members, the material of which was moving abroad through channels other than the Association".

Further implementing its policy of controlling all possible material which might fall into the hands of other exporters, Alkasso, until 1939, maintained with non-member manufacturers of alkalis within the United States contracts containing provisions appointing it the exclusive export agency of the producer (Gov. ex. 120).

Additional precautions against unauthorized exports were taken by each of Alkasso's members by inserting in all domestic sales contracts clauses stipulating that the material sold was for domestic consumption only and not for export. Such a provision was adopted "as a result of the decision of the directors of the Association" and was another link in the chain to prevent the shipment of alkali tonnage from the United States through exporters who were not members of Alkasso (Gov. ex. 60, 61, 62). Whenever domestic purchasers of material permitted alkalis to filter into unauthorized export channels, defendants thereafter cut off the buyer's supply by refusing to make additional sales (Gov. ex. 16, 17, 68, 79, 80, 87, 92, 98, 112, 114), for it was the open and avowed policy of the Association and its members to prevent what was euphemistically termed "bootlegging" (Gov. ex. 70, 71, 99, 100).[27]

An elaborate statistical system was utilized to obtain knowledge of all shipments exported outside the Association and reaching foreign territory. If alkalis reached Alkasso's own markets, it was informed of the shipments and the source, through re-

---

[24] See Gov. ex. 71. California ash reaching Norway and Sweden caused the Germans to threaten to sell "willy-nilly" on the continent (Gov. ex. 28).

[25] See Gov. ex. 82, 83, 84, 85, 93, 95, 102, 103, 104. Secure from foreign competition in exclusive markets and agreeing upon fixed prices with I.C.I. in joint markets, Alkasso employed the monopolistic price as a weapon to abolish American competition in these areas. (Gov. ex. 82, 83, 85, 102, 104) But this was only an alternative remedy to the control of material and the elimination of all competing exports from the United States itself (Gov. ex. 83, 84, 104).

[26] Recommendations for the readjustment of the business of Pacific Forest Industries, an Export Trade Association, Ap. 1-13889 (Jan. 27, 1940). The Federal Trade Commission recommended that Pacific Forest Industries, an association organized under the Webb Act, no longer maintain contracts which in any way prohibited members from selling material directly to other American exporters. See Temporary National Economic Committee, Investigation of Concentration of Economic Power, Monograph No. 6, Export Prices and Export Cartels, 76th Cong., 3d Sess., 1940, p. 130.

[27] The attitude of defendants regarding independent exporters is well portrayed by the bold statement of Calkex in its correspondence that "it will be unsatisfactory to allow the Los Angeles Chemical Company to remain in the export soda ash business. This same argument applies also to other jobbers who likewise wish to continue exporting small quantities of Soda Ash." (Gov. ex. 110)

ports from its foreign agents. Material infiltrating into the exclusive preserve of other parties to the cartel was identified and such information transmitted to Alkasso directly from I.C.I. or indirectly through Belgian Solvay. Alkasso also maintained inspectors at docks within the United States to scrutinize material leaving the country. From this information, blacklists of all "bootleggers" were compiled by Alkasso and circulated throughout its membership to prevent future sales. Lest all these intricate measures against errant exports should prove in some instances inadequate, the Association maintained "standing orders with certain parties in the trade to purchase at any time any loose or available tonnage which could reach the hands of export dealers or regular exporters". (Gov. ex. 9)

The formation of Calkex was an integral part of the plan to control the exports of domestic competitors. Calkex was a direct incident and corollary of the cartel arrangement in that the primary purpose of its organization was to withdraw California ash from the already apportioned territory of Norway, New Zealand and Australia, and to market it in conjunction with and under the direction of Alkasso. Once established, Calkex employed the same devices to stifle export competitors as did Alkasso and cooperated fully with Alkasso toward this end.[28]

The effect of the means adopted by Alkasso in eliminating its export competitors was due in no small measure to the concentrated power manifested by Alkasso in the export field. For the larger part of the duration of the conspiracy, Alkasso was the export agent for almost all the producers of alkalis in the United States. Until 1941 it exported or controlled the export of well over ninety percent of all alkali material leaving this country. Finch, the Association's president, could recall the name of only one domestic manufacturer of alkalis which exported independently for a short period of two years, and well he could speak with a sense of accomplishment when, in 1937, he wrote of the "great measure of control we have exercised over all foreign markets for many years, in the face of enormous supplies available here for subterranean traffic, not to mention the great benefit our control has meant to the British generally in the way of prices." (Gov. ex. 98)

There is no merit in defendants' original argument that the word "competitor", in the proviso of the Webb Act making the Sherman Act applicable to any agreement or act "in restraint of the export trade of any domestic competitor of such association", was not intended to embrace the independent exporter. The explicit language of the proviso rebuts this contention. Nor does answer lie in the fact that the Webb Act seemingly contains no prohibition against monopoly combinations, for whatever degree of combination the Webb Act may exempt from the anti-trust laws, it does not sanction the use of monopoly power to extinguish the competition of independent domestic competitors engaged in the export trade.

Not only must the practices of defendants outlined above therefore fall as part of the overall international cartel heretofore declared illegal, but they must also be condemned as integral elements in an overt conspiracy, specifically interdicted by the Webb Act, to eliminate domestic competitors engaged in the export trade.

No lengthy discussion is necessary of the long line of decisions under the Sherman Act condemning such practices when their result is to restrain trade or fetter competition. The policy dictated by

---

[28] Calkex by a resolution of its Board of Directors required members to export exclusively through Calkex (Gov. ex. 146). It also abolished the formal requirement of the resolution in 1940 (Gov. ex. 147), but all members continued to export exclusively through Calkex thereafter. In domestic sales, Calkex members likewise maintained contract provisions restricting the use of ash sold to the consumption of the purchaser (Gov. ex. 164, 165). Its members supplied statistics regarding export shipments made independently of Calkex (Gov. ex. 107), and cooperated fully with Alkasso in eliminating export competition (Gov. ex. 74, 93, 95, 97, 108).

the Act prohibits the use of concerted boycotts and coercion[29], circulation of blacklists,[30] the employment of espionage systems[31], where that conduct tends in any way to "hinder or obstruct the free and natural flow of commerce * * *". Federal Trade Commission v. Beech Nut Packing Co., 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882. The general provisions in the domestic contracts of Alkasso's members prohibiting the resale or export of alkali runs afoul of the Sherman Act in that defendants have unlawfully attempted to control the path of alkalis in interstate and foreign commerce after sale of such material has occurred. Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; United States v. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; Federal Trade Commission v. Beech Nut Packing Co., supra. The exclusive agency relationship between Alkasso and its members, whether lawful or not when standing alone, cannot be sanctioned when it has been utilized as an important element in a conspiracy to eliminate export competition. See United States v. General Dyestuff Corp., D.C., 57 F.Supp. 642, 648.

VII. Stabilization of the Domestic Price of Caustic.

The final aspect of the conspiracy charged is that Alkasso and its members employed the Association as a device for fixing and stabilizing the price of caustic soda in the United States within the meaning of the proviso of the Webb Act declaring the anti-trust laws applicable to any agreement, understanding, conspiracy or act "which artificially or intentionally enhances or depresses prices within the United States." There is no substantial dispute as to the facts presented by the evidence; contention is based mainly upon the inferences to be derived therefrom.

Both defendants' and the Government's evidence indicate a remarkable stability in the price of caustic soda from a period beginning in 1931. The government's statistics from the Oil Paint & Drug Reporter reflect a practically constant domestic quotation of $2.30 per ton for solid caustic from August 9, 1937 until the end of 1944 (Gov. ex. 212). From November 1933 until August 1937, the quotation for domestic caustic soda in car lots was a constant rate of $2.60 per ton (Gov. ex. 212, 213), while contract quotations between 1931 and 1933 varied only between $2.50 and $2.55. Defendants' exhibits show more fluctuation in price over the long run period—1922-1942. But the defendants' expert admitted that their price studies reflected an unusually stable price structure from 1931 on, while the report of Diamond Alkali, which appeared to assume an important part in the construction of defendants' statistics, showed only one shift in the price of solid caustic during the twelve year period, 1931-1943 (Gov. ex. 224). The domestic price stability of caustic is in marked contrast to what defendants showed were frequent and sharp fluctuations in the average export return (Def. ex. K), a contrast more significant when it is considered that the unwavering price on the domestic market failed to reflect the recession of 1937, while export prices showed sharp response to the vagaries of the economic cycle.

Taking the remaining evidence introduced with this stable price structure of caustic in the domestic market as background, there is ample ground for the conclusion that defendants utilized Alkasso as a means of removing surplus caustic soda from the domestic market in order to maintain the current price. Defendants argue that the price of soda ash also remained stable throughout the same period, and from that they seek exoneration on

[29] Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; Eastern States Lumber Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951.

[30] Eastern States Lumber Ass'n v.

United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341; Straus v. American Publishers' Ass'n, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.,1915A, 1099.

[31] Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882.

the ground that no charge of price fixing of the latter commodity has been made. However, the fact that the Government has not levelled any charge against defendants because of the stability of the price of soda ash does not alter the conclusions to be drawn from the stability of the price of caustic soda, especially where it has been shown that the problem of disposing of a surplus in caustic soda, unlike soda ash, was a continuing and plaguing one for the Association and its members.

Behind the need for the employment of Alkasso as a thermostat to keep constant the domestic price of caustic soda was the rapid rise from 1923 to 1945 in the production of electrolytic caustic (Gov. ex. 201). From 1931 to 1941, electrolytic caustic production increased some 270%. While the production of ammonia caustic remained relatively stable until the advent of the war, electrolytic caustic production, compared with total production of caustic, increased from 28% in 1923 to over 50% in 1941 and to 63% in 1943 (Gov. ex. 200, 202). As previously noted, this tremendous rise in the amount and percentage of electrolytic caustic produced was due to the great increase in the demand for chlorine. But it placed upon the Association and its members the urgent and pressing problem of disposing of excess production in such a way that it would not affect the going price in the domestic mart.

Alkasso was always keenly aware of the problems caused by the increase in electrolytic caustic. Finch wrote in 1942 of the "problem" confronting "the industry with this surplus material which continues to increase" (Gov. ex. 140). In 1933, Finch, in a memorandum to Dow Chemical Company with regard to membership in Alkasso, declared that "Hereunder the electrolytic problem is always recognized * * *" (Gov. ex. 126A), and at Alkasso's meeting of directors, it was indicated that the problem of the Association was primarily one "of distributing excess caustic soda" (Gov. ex. 129).

The concern demonstrated was not merely solicitude over the disposal of material which the domestic market could not consume, but was intimately identified with the preservation of the domestic price structure of defendants' product. In a letter to Alkasso, Dow, an electrolytic producer, mentioned "the intelligent export disposition of * * * (Dow's) * * * output, or the possible alternative of a heavy cost to those who participate to a much greater percentage in the country's total alkali business * * *" (Gov. ex. 124). And Hooker, another electrolytic manufacturer, wrote in opposition to a proposed plan of Solvay: "If we take the position in advance, which I think we have heretofore done, that we expect to place all of our material in the Domestic market and if possibly the other electrolytics do likewise, Solvay * * * might be forced * * * [to] give up their avaricious suggestion." (Gov. ex. 125)

So, too, in its negotiations with the British subsequent to 1933, it is clear that Alkasso was motivated by its need to obtain additional markets in order to dispose of material which might tend to depress the price of caustic within the United States. White of I.C.I., New York, indicated that if Carbide & Carbon, a manufacturer which purchased chlorine and caustic, utilized products other than caustic in its production, the backup in caustic in this country might force Finch to press too hard for export concessions from I.C.I., resulting in a breakdown of the international cartel and a crash in the domestic price. (Gov. ex. 217, 218) The British tried to persuade Finch to solve this problem by agreement with Carbide, but expressed concern over the fact that "the export market is being regarded by all these people as the ultimate element for stabilisation." (Gov. ex. 220) On June 4, 1935, White wired London of the average prices in the United States market, indicated that the excess caustic problem was not one of a temporary nature, and said that he had informed Finch that it was doubtful "whether I.C.I. could accept or would discuss change in quota to relieve internal stress brought about by domestic competitive affairs" (Gov. ex. 220). In the same cable White informed London that "* * * duPonts had learned of excessive caustic stocks and of possibility of

break in price here arising from disagreement with us * * *". During this period the British remained adamant in refusing to change quotas "enabling states industry continue to maintain stability home market * * *" (Gov. ex. 20). Not only does the evidence demonstrate an intent on the part of Alkasso and its members to maintain domestic price stability by means of Alkasso, but it indicates clearly certain methods and devices employed by Alkasso to that end.

It was the policy of the Association to export caustic in preference to all other alkalis. By far the greatest proportion of its exports were electrolytic caustic (Gov. ex. 133). Premiums were placed on higher grade caustic to encourage purchases of lower surplus grades. (Gov. ex. 135) Markets not supplying a ready demand for caustic were abandoned, and Alkasso declined the sale of tonnage in other alkali products because "* * * the Association problem primarily being one of caustic soda and an increase in caustic shipments being more desirable for that reason". (Gov. ex. 129)

While at the beginning of each year, Alkasso established export quotas or allocations of material for each of its members based on the percentage of the member's sales to total sales in the domestic market, it readily abandoned its prearranged allocations and granted preferences or "overages" to producers of electrolytic caustic whenever surpluses of that material accrued. These overages granted to electrolytic producers were correspondingly deducted from the tonnage previously scheduled to be accepted from ammonia producers, and were, in the words of Finch, "due to the pressure upon us for electrolytic material * * *". Alkasso also purchased surplus electrolytic caustic from non-member producers upon the latter's request and stored it at already overcrowded warehouses.

Defendants' showing of overages in bicarbonate and ash does not rebut the inferences to be derived from their conduct in marketing caustic in the light of the testimony of Finch that the overages in ash and bicarbonate were due to brand preferences or to decisions by members not to ship and the absence of a showing that there was any surplus or overproduction of these latter products. Nor does the minuteness, percentagewise, of overages in caustic to total production remove the taint which must be accorded this practice, where it is shown to be an important element in a scheme designed to remove all surplus caustic from this market in order to stabilize the domestic price.

The final aspect of defendants' conduct aimed at implementing the stabilization program in caustic was to employ Alkasso as a huge warehouse for the storage of excess electrolytic caustic until such material could be moved abroad and out of the domestic market. This was done, according to Finch, directly as a result of the pressure exerted upon Alkasso by electrolytic members and non-members. While the normal carrying requirements of Alkasso demanded a stockpile of from 2,500 to 4,000 tons of caustic, at times it had on hand average monthly stocks in excess of 10,000 tons of material. In 1935 the cost of storage to Alkasso for caustic held in this country approximated $3,000 per month (Gov. ex. 142) and the average yearly cost computed in 1939 amounted to $25,000 (Gov. ex. 144). When storage at seaboard by Alkasso became too expensive excess caustic was stored at members' plants for the account of Alkasso and Alkasso paid five cents per month per ton for storage expenses thus incurred.

In summary then, it must be concluded that the domestic price of caustic showed remarkable stability over a large period of the conspiracy; that defendants utilized Alkasso to dispose of surplus caustic when it would tend to depress the price in the domestic market; that the purpose in preferential exports of caustic, allocation of overages to producers of surplus electrolytic caustic, and the storing of excess material was to neutralize the tendency of surplus caustic to become a price depressant.

A suggestion is made that stabilization of price was not "artificially enhancing or depressing" prices within the *

meaning of the proviso of the Webb Act. The claim is baseless. Interpretation of the anti-trust laws does not turn upon such semantic niceties. The practice of domestic price stabilization by an export association and its members finds no sanction in the Webb Act and must be condemned under the Sherman Act, when, for half a century, the Supreme Court "has consistently and without deviation adhered to the principal that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." [32]

Defendants assert that the export market, representing only from between seven to ten per cent. of the total production of caustic in the United States, would not prove to be an effective device for maintaining constant price levels within this country. The evidence would not necessarily warrant this conclusion. In any case, however, the facts come within the rule laid down in the Socony Vacuum Case, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, declaring illegal any agreement for the purchase of "distress" or surplus material amounting to a small percentage of the total product where it is shown that such practice would materially interfere with the free interchange of those competitive forces which ultimately determine the commodity's going price. See United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 445.

VIII. The Issue of Mootness.

Defendants originally argued that the issues involved in the case had become moot in that the recent war caused a practical termination of all international agreements and that there appeared little likelihood that the practices complained of would be resumed. The evidence fails to bear out this claim.

In 1941, two years after Britain had entered the war, Alkasso and I.C.I. intended to renew the 1936 agreement but such action was made unfeasible by British economic regulations. Despite the state of belligerency and uncertainty of governmental policy, however, both parties did arrive at a mutual understanding. While recognizing that wartime conditions made it mandatory to limit the extent of cartel coverage to some degree, they nevertheless reaffirmed the division of exclusive territories which had been allotted under the agreement of 1936 and also provided in detail for certain joint territories (Exhibit F to the Complaint). Finch testified that this division of markets was respected by both parties until the time the instant action was begun. Alkasso also negotiated sales abroad through agents of I.C.I. in South America until 1944 under arrangements stemming from the cartel.

The evidence also shows that I.C.I. and Alkasso employed the cartel as a means of allocating material during the period of war shortages. In 1942 Alkasso wrote to the Department of Commerce to protest contemplated governmental action in dividing the South American markets between Britain and the United States. Alkasso set forth the international cartel agreements between it and I.C.I. and requested "that both of us be left alone under this arrangement to work out the problem of feeding Latin American industries, for which previous arrangements were made and along which lines both of us have been working and will continue to work." (Gov. ex. 57)

It is clear, therefore, that the war did not bring about a general abandonment of all cartel practices. No doubt the war necessitated curtailment of many cartel activities; perhaps it even caused the demise of certain co-conspirators such as Belgian Solvay and I. G. Farben. But there is no evidence indicating that defendants considered the state of war other than an inopportune interlude necessitating only retrenchment until the cessation of

---

[32] United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129; also United States v. Trenton Potteries, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107.

hostilities, when again the world markets in alkalis could be apportioned.

On reargument held on May 19th and 20th, 1949, counsel for defendants stated: "* * * this association is going very strong today in foreign markets, and there is not any cartel of any kind whatsoever, and if we can receive some expression or instruction as to whether we can or cannot have one and under what circumstances, and all the rest of it, that is an important thing. I see no reason why we can't tomorrow have a new one if we need to under the law * * *."

Injunctive relief is therefore eminently proper, for even where activities have totally ceased before the institution of suit, the equitable power to provide against their resumption still subsists unless it be shown that there is no reasonable expectation that such practices will recur. United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 448; see also Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102, 105; United States v. National Lead Co., D.C., 63 F.Supp. 513, 526-527.

Defendant Calkex urges that injunctive relief against it is improper because for all intents and purposes it has been inactive in the export field since 1941 and two of its three original members have withdrawn, leaving it a mere ghost or corporate shell. However, the evidence shows that the demise of Calkex in the export field was due solely to wartime difficulties in obtaining supplies of ash to export and in obtaining adequate shipping facilities. Despite these obstacles, the directors in 1941 recommended "that the Association should be preserved regardless of present difficulties" (Gov. ex. 166). Nor has the agreement between Calkex and Alkasso, which continues to link Calkex to the international conspiracy, ever been formally terminated. The fact that there is now but one member of Calkex still nursing its faint flame of life does not preclude the revival of its export activity when postwar supplies of ash become more readily available. This is all too likely to occur when it is considered that the withdrawal of its principal member, American Potash, was at the insistence of the Alien Property Custodian who is now no longer in control of corporate policy. Furthermore, Calkex has not seen fit to rest throughout these proceedings solely upon the contention that it has become defunct. On the contrary, it has argued in behalf of the propriety of the conduct engaged in by all defendants.

Since there appears reasonable likelihood of the resumption of its activities, and since it has constantly asserted the legality of its past behavior, Calkex, too, must submit to the equitable powers of this court. United States v. Aluminum Co. of America, supra; Otis & Co. v. Securities & Exchange Commission, 6 Cir., 106 F.2d 579, 584; Walling v. Haile Gold Mines, supra. See United States v. Trans-Missouri Freight Association, 166 U.S. 290, 308, 17 S.Ct. 540, 41 L.Ed. 1007.

Findings of fact will be made and a decree will be entered in accordance with this opinion.